PEAT MARWICK MAIN f/k/a Main Hurdman, Appellant,

v.

Lawrence F. HAASS, Appellee.

No. 04–88–00199–CV.

Court of Appeals of Texas, San Antonio.

June 28, 1989.

Rehearing Denied Sept. 14, 1989.

Dan Matthews, W. Wendell Hall, Fulbright & Jaworski, San Antonio, for appellant.

Paul M. Green, Lang, Ladon, Green, Coghlan & Fisher, San Antonio, for appellee.

Before BUTTS, REEVES and CARR, JJ.

## OPINION

REEVES, Justice.

Main Hurdman—now Peat, Marwick, Main & Company—an accounting firm, brought suit against Lawrence F. Haass to recover reimbursement fees, merger acquisition costs, and other damages that allegedly resulted when Haass breached a partnership agreement with Main Hurdman. Haass counter-claimed, seeking the value of his capital account and attorney fees. After a jury trial, judgment was entered denying recovery to Main Hurdman and awarding Haass his capital account and attorney fees. Main Hurdman timely perfected this appeal. The judgment of the trial court is reversed and rendered in part, and remanded in part, according to the opinion of this court.

Main Hurdman, hereinafter identified as MH, brings eighteen (18) points of error, while Haass presents two cross-points. Discussion of these points of error is preceded by the necessary history which brought about the filing of this law suit.

### The Merger

In 1982, a San Antonio accounting firm, Chorpening, Jungmann and Company, hereinafter identified as CJ, had four major partners—John Sowell (35% ownership), Walter Jungmann (25% ownership), Anthony Koch (22.5% ownership), and Haass (11.5% ownership). Jungmann and Koch wanted to immediately retire. Sowell was seriously considering retirement. Merger negotiations with MH were initiated to insure retirement benefits for the three. In such a merger, MH would acquire CJ's client base and goodwill, and MH would pay retirement, disability and/or death ben-

efits to the retiring partners. Haass was not to receive any kind of immediate compensation for his share of the CJ client base. Instead his ownership share in CJ was transferred to MH, and he became an MH partner in proportion to his CJ shares.

The preliminary merger discussions were conducted without Haass, and the proposal was presented to him after the basic agreement was concluded. Haass had misgivings from the beginning and voiced these to both MH officials and the other CJ partners. However, he did eventually sign the merger agreement. The merger agreement set out the details as to assets, liabilities, retirement benefits and other necessary items to memorialize the transaction. This agreement also made reference to the MH standard partnership agreement.

Sowell agreed to be partner-in-charge of the combined firms, at least for a transition period. However, almost immediately after the merger was accomplished, Sowell became desperately ill and completely withdrew from the organization. With Sowell out of the picture, Haass and other key personnel became further disenchanted with MH's policies and procedure. On July 19, 1984, Haass and several lower echelon employees—Bruce Lindow, Caroline Rawie, and Phil Sagebiel—tendered their resignations. A few days later, Vicki Ravenburg, another employee, also resigned. Shortly thereafter these people opened a new accounting firm, Haass and Company. It is undisputed that the new organization was planned and organized while the aforementioned were on MH's payroll.

MH sued Haass on the partnership agreement and further sought damages alleging he violated his fiduciary duty to MH. Haass answered with a general denial and further alleged that (1) he had not executed the partnership agreement; (2) the consideration for the agreement failed; (3) he had been misled by representations made by MH; (4) MH was estopped to enforce the agreement; (5) the agreement operated in restraint of trade and as a penalty; and (6) he also alleged the "clean hands" doctrine. He also asserted his

right to his capital account[1] and further alleged the agreements operated as a restraint of trade and/or as a penalty.

■ As this court discusses the points of error alleged by MH, we will also examine the merger agreement between CJ and MH, and MH's partnership agreement. The merger agreement, signed by Haass, identifies Haass as a partner in the combined firm. Haass admits to signing the merger agreement but maintains he did not sign the partnership agreement. However, the merger document incorporates, by reference, the standard MH partnership agreement. By signing the merger agreement, Haass became bound by the partnership agreement. *See INA of Texas v. Leonard*, 714 S.W.2d 414, 416 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.); *Kuzel v. Aetna Insurance Co.*, 650 S.W.2d 193, 195 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.).

### The Misrepresentation

By its first five points of error, MH argues there was no evidence or, alternatively, insufficient evidence, to support the jury's answers to the special issues dealing with a representation allegedly made by MH to Haass to persuade him to join in the merger. Haass testified he signed the merger agreement because (1) he was threatened with a lawsuit by the CJ retiring partners; (2) he was assured that Sowell would be the partner-in-charge (PIC); and (3) he was assured there would be no significant change in the way he practiced accounting and handled his clients. MH counters that any and all assurances came from the CJ people, especially Sowell.

■ In deciding a no evidence point, we may consider only the evidence and inferences which, viewed in their most favorable light, support the findings and we must reject all contrary evidence. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). In considering an insufficiency claim, we consider all evidence to determine whether the findings are so against the great weight and preponderance of the evidence

as to be manifestly unjust. *Pool v. Ford Motor Co., Inc.*, 715 S.W.2d 629 (Tex.1986).

Testimony and exhibits established that Haass was the linchpin of the merger. James Hendrix, the MH negotiating representative, attested to MH internal documents which expressed that without Haass' participation, the deal with CJ was not attractive to MH. There was evidence that the retiring CJ partners not only threatened Haass with a lawsuit, but they also agreed to smaller amounts of retirement benefits if Haass left the combined firm.

As to the exact representations that were presented to the jury, Haass testified as follows:

Q. Mr. Haass, is it your position today that you were caused to sign the merger agreement because Main Hurdman misrepresented things to you and because Main Hurdman put you under duress?

A. I signed the merger agreement because certain things were misrepresented to me by Main Hurdman.

\* \* \* \* \* \*

(MR. MATTHEWS) Q. Did you met with Mr. Hendrix of Main Hurdman?

(HAASS) A. I did.

Q. Without total chapter and verse, just give us an idea. This is your first contact with a Main Hurdman individual, not that you first met, but concerning this matter.

A. Right.

Q. Tell us about it.

A. I met with Mr. Hendrix. I handed him some information and background about me, my wife, my children, how old I was, things like that, education in general. Although, I think he already had that. I think he just wanted to— He asked me what I thought about the merger. I express to him I didn't like the idea. I expressed to him my concerns, the big firm, national firm atmosphere versus a small firm.

---

1. A capital account is formed by each partner's share of net profits made by the firm in any given year. The account is allowed to accumulate and draw interest.

I expressed my concern that things would be run from some other office other than the San Antonio office. I expressed concern about my clients. I felt that they would eventually leave if they were not handled properly.

We talked about—He talked about the benefits at Main Hurdman, very similar to what Mr. Sowell had talked about. That, basically, is what we discussed.

Q. At that first meeting, did he respond to your concerns about the takeover by a national firm and the national firm atmosphere by saying anything as to how that was going to be handled in this particular case or did that come up another time?

A. I think at that meeting he expressed, I think it was that meeting, it may have been another meeting, but I think at that meeting he expressed that John Sowell would be the partner in charge and that I was going to be the partner in charge of combined services area and Bill Sanders would be the audit partner.

Q. He was a Main Hurdman person?

A. Right. And Stan Paris, also from Main Hurdman, would be in charge of the tax department and that as much as possible he was going to let John run the office as he saw fit with as little interference as possible from the national office and I think I asked at that point in time if that was possible and I do not recall what his response was.

Hendrix testified as follows:

(MR. GREEN) Q. Now, when you initially talked to Larry, he expressed some concern about not only the merger itself, but the way it had come about, did he not?

A. Yes, he did.

Q. Is it true that he resented not being told about it as it was brewing?

A. He expressed that feeling to me.

Q. Yes, sir, is it not true that he expressed concerns to you about the effect of a national accounting firm merger on a local firm's operations?

A. Generally.

Q. He had a distrust as to the—distrust is the wrong word. He had concerns that you couldn't function in that national firm atmosphere. Did he express that to you?

A. He expressed concern, I think, that there would be significant changes in the way he had to do business and handle his clients.

Q. Did you seek to alleviate some of his concerns in that regard?

A. Yes, sir.

Q. Did you, for example, tell him that all efforts were going to be made by Main Hurdman to allow the San Antonio office to proceed much along the lines that Chorpening Jungmann had handled its business?

A. I believe I expressed to him that the—Our main concern focus was on service to the clients. We would build into the organization and into the process the Main Hurdman procedures, but that I thought that that would not hamper him in servicing his clients.

The purpose of those procedures was to allow him to present a better product to his clients.

Q. Did you tell him that Mr. Sowell would be made partner in charge of the office and serve as a buffer during the merger period?

A. I don't recall using the term buffer, but he certainly was told that whenever the arrangement was made that Mr. Sowell would be the partner in charge.

*Haass said he understood that Sowell was going to run the office to the extent possible under MH's policies and procedures.* (Emphasis added.)

The jury found that (1) MH represented to Haass that there would be no significant change in the practice of accounting after the merger; (2) the representation was untrue; (3) the representation was material to Haass; (4) Haass relied on the representation when he executed the merger agreement; and (5) Haass' reliance on the representation was reasonable.

■ A misrepresentation may effectuate a form of fraud. A representation consists of words or other conduct manifesting to another the existence of a fact. *Custom Leasing, Inc. v. Texas Bank & Trust Company of Dallas,* 516 S.W.2d 138, 142–43 (Tex.1974). A misrepresentation is a representation which, under the circumstances, amounts to an assertion not in accordance with the facts. *Id.*

■ Under the facts of this case, there was no valid misrepresentation. In its simplest term, what happened here was that John Sowell died. All that MH had promised was that he would be the partner in charge. Haass, who signed the merger agreement, relied upon Sowell's presence as a buffer. Furthermore, he had talked to former college friends employed by MH and had reasonable opportunity to investigate. What was material to Haass and relied upon by Haass was Sowell's presence.

■ Furthermore, both MH and Haass were looking to a future act. The necessary elements to support a cause of action for fraud or misrepresentation, when the alleged misrepresentation concerns an action to be accomplished in the future, are: (1) the promisor made a promise to the promisee to perform a particular action in the future; (2) at the time the promise was made the promisor did not intend to perform; (3) the promisee relied on such promise; (4) the promisee acted upon the promise to his detriment; (5) the promisee suffered damage thereby. *Wolf v. Fernandez,* 733 S.W.2d 695, 697 (Tex.App.—San Antonio 1987, writ ref'd n.r.e.). In this case, MH promised that Sowell would be the partner in charge; this promise was fulfilled. With it established that MH did not make a misrepresentation, then Haass' other issues must all fail. As a matter of law, we find no evidence to support the jury's findings that deal with misrepresentation.

### Estoppel

■ The jury also found that MH was estopped to enforce the agreement. In order to constitute an equitable estoppel there must exist (1) a false misrepresentation or concealment of material facts; (2) it must have been made with knowledge—actual or constructive—of the facts; 3) the party to whom it was made must have been without knowledge or the means of knowledge of the real facts; (4) it must have been made with the intention that it should be acted on; (5) the party to whom it was made must have relied on or acted on it to his prejudice. *Gulbenkian v. Penn,* 151 Tex. 412, 252 S.W.2d 929 (1952). Without a misrepresentation or a concealment of a material fact, there can be no estoppel argument. Haass argues that the question of estoppel must stand apart from the question of misrepresentation because estoppel looks to a broader picture of how MH behaved after the merger and faults MH for making no efforts to solve the problems created by Sowell's terminal illness and death.

■ This argument does not comply with the basic principle of estoppel: Estoppel is a rule of equity applied to prevent a person from taking advantage of a condition or situation when, with knowledge of the facts, he has so conducted himself to cause the other party to change his position for the worse and results in the former being prohibited from asserting an otherwise valid right. *Muller v. Leyendecker,* 697 S.W.2d 668, 674 (Tex.App.—San Antonio 1985, writ ref'd n.r.e. June 18, 1986). Testimony from Haass established that he understood Sowell would have to work within the framework of MH policies and procedures. With Sowell out of the picture, it would be reasonable that MH would continue its usual and normal practices and procedures. This would happen at any business. As a matter of law, we find there to be no evidence upon which the jury finding as to estoppel can be maintained.

### Exclusion of Evidence

MH next complains that certain exhibits were wrongly excluded by the trial court. Exhibit 16 is a collection of approximately 200 letters from MH clients, authorizing MH to release files to either Haass and Company and/or to one of the accountants

at Haass and Company. MH wanted to use the letters to impeach the testimony of Sagebiel and to show that Haass had provided a form letter to MH clients, while in MH's employ, thereby violating his fiduciary duty to MH.

It is obvious that most of the letters are identical in format. It is also significant that only a small number refer to Haass, personally, by name as the principal accountant. Most authorize a release of files to Haass and Company in care of a certain accountant. Nine of the letters are not dated. One is dated July 17; the remainder are dated July 20 and later. Testimony established that though Haass gave notice effective in August, MH officials asked him to leave on July 20. Exhibits 23–26 are four letters, all dated July 19. Exhibits 23 and 25 are identical while 24 and 26 are very similar. These do not identify any forwarding accountant—they just apprise MH that new accountants have been engaged.

MH argues both sets of exhibits show that (1) Haass solicited clients before he officially resigned; (2) Haass provided a form letter to these clients; (3) the letters impeach the testimony of Haass and Sagebiel who both testified that a form letter was not provided until late August.

■ The general rule in this State is that any evidence is relevant to a proposition if it tends to prove or disprove any material fact about that proposition. *Rego Company v. Brannon*, 682 S.W.2d 677, 682 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.); TEX.R.CIV.EVID. 402. However, even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by consideration of undue delay, or needless presentation of cumulative evidence. TEX.R.CIV.EVID. 403. When relevant evidence has negative effects, admission of the evidence is in the discretion of the trial court and the court's determination of admissibility is subject to reversal only for an abuse of that discretion. *Williams v. Union Carbide Corp.*, 734 S.W.2d 699, 703 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.).

■ There are several disturbing aspects to the letters. First of all, there is a major danger the letters would create a side issue that would unduly distract the jury from the issues that revolved around Haass and Haass only. The other accountants' names are used repeatedly in more than half of the letters. These people were not bound by the merger agreement and were not on trial. MH made no attempt to segregate the letters nor limit their admissibility in any fashion.

Furthermore, the letters are cumulative of the testimony of Haass, Rawie, Sagebiel, Lindow, all of whom testified they told their clients, in advance, that they were leaving. Sagebiel told his clients how to get their records from MH to him. Furthermore, Exhibits 3 and 17, introduced in evidence, listed clients who switched from MH to Haass and Company. The jury heard Sagebiel testify that a form letter was not provided until late August. However, MH was able to present a different date—in July—to the jury:

(MR. MATTHEWS) Q. All right, sir. Also, at this point in time, it's true, is it not, that you and the other who were planning to leave were contacting clients and letting them know that you were going to a new firm?

(HAASS) A. No, the—well, I specifically contacted three clients prior to my leaving Main Hurdman.

Q. Prior to July 19?

A. Prior to July 19. I do not know what the other people, how many they contacted or who they contacted.

Q. You're aware, are you not, that there exist several letters of resignation or withdrawals from clients to Main Hurdman that are, in fact, dated on or before July 19 that finally wound up in your office?

A. I do not know that the letters are dated before July 19.

Q. Yes, sir.

A. I do not recall those. There may have been.

Q. Do you recall one of the four of you preparing a form letter and distributing it to clients for use in quitting Main Hurdman and coming to you?

A. In August of '84, I prepared a form letter and that was because clients would say, "Do you have some type of letter I can use to send to Main Hurdman in order for me to obtain my records from them?"

\* \* \* \* \* \*

(MR. MATTHEWS) Q. Mr. Sagebiel, is it true that one of your group that left Main Hurdman on July 19th, 1984 supplied two clients a form letter or a suggested language of a letter to use in quitting Main Hurdman and moving over to your firm?

(MR. SAGEBIEL) A. If I may elaborate on that subject, after we were in our offices, on August 29th of 1984, possibly a month thereafter, so many clients were asking us for that that had already told us they wanted to come and be clients of our company and they were asking for appropriate language to tell Main Hurdman they were terminated and we were being hired and to please provide them with the necessary information they would need that we did develop a form letter, but it was only given to clients that requested it and we did not volunteer it to anyone.

MR. MATTHEWS: Your Honor, I ask the Court to note the date in his testimony and note the date in this letter.

Therefore, the jury was aware that the date given by Haass and Sagebiel was different from the date on the letter. We cannot say the trial court abused its discretion in excluding the evidence.

### Failure of Consideration

 MH further complains the trial court erred in overruling MH's objection to the inclusion of the special issues dealing with the consideration because the want or failure of consideration is an issue of law for the court. We agree. What constitutes a consideration for a contract is a question of law. *Williams v. Hill*, 396 S.W.2d 911, 913 (Tex.Civ.App.—Dallas

1965, no writ). The issue concerning a failure of that consideration is also a legal one within the province of the trial court. *See Schepps Grocery Co. v. Burroughs Corp.*, 635 S.W.2d 606, 608 (Tex.App.—Houston [14th Dist.] 1982, no writ); *Kunkel v. Poe Land & Development Co.*, 393 S.W.2d 191, 194 (Tex.Civ.App.—Corpus Christi 1965, no writ). In addition, MH complains there is no evidence or factually insufficient evidence to support the jury responses that the consideration failed prior to Haass' departure.

 By the merger agreement, MH promised Haass the following:

(1) he would be admitted as a partner in MH;

(2) he was entitled to and received a monthly draw;

(3) he would be entitled to profit participation;

(4) his capital account was transferred from CJ to MH;

(5) his years of service, for retirement purposes, was transferred.

By oral understanding, Haass was promised Sowell would be the partner in charge. In this case, Haass received all items for which he bargained. What neither party bargained for was Sowell's death. We conclude the agreement was based on adequate consideration, and the consideration did not fail.

### Solicitation of Clients

MH next asserts that the evidence establishes as a matter of law that while a partner with MH, Haass directly or indirectly solicited clients of MH to cease doing business with MH and to become clients of Haass' new firm. The jury, however, found otherwise.

 When one attempts to overcome an adverse finding as a matter of law, he must overcome two hurdles. *Holley v. Watts*, 629 S.W.2d 694, 696 (Tex.1982). First, the record must be examined for evidence that supports the jury's findings, while ignoring all evidence to the contrary. *Id.* If there is no evidence to support the fact finder's answer, then secondly, the entire record

must then be examined to see if the contrary proposition is established as a matter of law. *Id.* The point cannot be sustained, unless the converse of the findings is conclusively established. *Precipitair Pollution Control v. Green,* 626 S.W.2d 909, 911 (Tex.App.—Tyler 1981, writ ref'd n.r.e.). As Haass was the only accountant sued and the only one subject to the merger agreement, the only evidence we can consider is that which concerns Haass. He categorically denied he had solicited any clients. He testified he had contacted three clients, before July 19, only to inform them he was leaving. The admitted evidence discussed above only establishes that some clients advised MH they were no longer going to employ MH as their accounting firm. There is no evidence in the record to tell us what was said or intimated to the people who did switch. Under this situation, we cannot say MH proved solicitation as a matter of law.

As to MH's argument that the jury verdict is against the great weight and preponderance of the evidence, we have considered all the evidence in the record and find that the jury's finding is credited by the record. *See Herbert v. Herbert,* 754 S.W.2d 141 (Tex.1988). The point is overruled.

### Fiduciary Duty

The jury did find that Haass used his time, talent, and energy to set up his new firm while he was still employed by MH. However, the jury refused to assess any damages and MH now argues this response of no damages is so against the great weight and preponderance of the evidence as to be manifestly unjust. MH is here attempting to tie its alleged damages to the solicitation issue. If the jury found Haass did not solicit clients, then it is not outside the scope of reason for the jury to conclude MH was not damaged. There is some evidence in the record Haass used his own time to organize his new concern. This point is overruled.

### Haass' Restraint of Trade Contention

The crux of this is the partnership agreement and specifically that part which de-tails how and under what circumstances MH is to be compensated when a partner (who is not retiring) leaves the firm. (See appendix for complete text.) The compensation has two parts: payment for firm clients who switch their business to the departing partner and reimbursement for client acquisition costs. Haass, by way of cross-points, contends the agreement is unenforceable because it operates in restraint of trade and as an oppressive penalty. He contends the provision is akin to a covenant not to compete and is therefore unenforceable because of its chilling effect on free enterprise. MH counters the provision is not a covenant against competition and it is enforceable because it is incident to the sale of a business.

Both sides seem at a loss as to what kind of label this provision of the agreement should wear. The provision provides, in relevant part, that "any partner ... who terminates ... and who, during the period of twenty-four months thereafter solicits or furnishes accounting or related services to firm clients shall compensate the firm...." The definition of "firm client" is extremely broad and encompasses: (1) any party who was a client of the firm as of the termination date or (2) becomes such a client during the twenty-four month period thereafter or (3) any other party in which such clients are a principal party in interest. It does not matter if the terminating partner opens his own business, engages in a new partnership or joins another firm as an employee.

In terms of the compensation to be exacted, a terminating partner is liable (1) for payment in full of all fees and expenses, billed or unbilled, due to the firm from such clients as of the date MH learns that the client will be served by the terminating partner or from the date such client notifies MH that it will be served by the terminating partner and (2) for reimbursement to MH for all direct costs (out-of-pocket expenses), paid or to be paid by MH in connection with the acquisition of such client including, without limitation, retire-

ment benefit obligations of any predecessor firm.

At this point, it is clear what this provision is not: It is not a covenant against competition; Haass remains free to practice his profession. It is not a restrictive covenant incident to the sale of a business as to Haass; MH merged with CJ and Haass did not sell outright his ownership interest in CJ to MH. Neither party has cited us to a Texas case that deals exactly with such a provision, and we have not found one on point or closely analogous. Other states—notably Florida, Oregon, and Montana—have dealt with similar agreements. A like fact situation to this instant case is found in *Dobbins, Deguire & Tucker v. Rutherford, McDonald & Olson*, 218 Mont. 392, 708 P.2d 577 (Mont.1985). In that case, the defendants were former firm partners who had signed the following agreement:

5. If this Agreement is terminated and Employee enters into a public accounting business for himself, in partnership with one or more accounts ... Employee agrees as follows:

a. To pay to employer an amount equal to one hundred percent (100%) of the gross fees billed by Employer to a particular client over the twelve month period immediately preceding such termination which was a client of Employer within the twelve month period prior to Employee's leaving Employer's employment, but which client is thereafter within one year of date of termination served by Employee, Employee's partners, ...

b. Such sum shall be paid in monthly installments over a three year period, the first such installment being due within thirty (30) days of the date when Employee, Employee's partners, ... does work for a particular client, and which payments, exclusive of the initial payment shall include interest as hereinafter stated.

c. Such sum shall bear interest at the rate of eight percent (8%) per annum on the declining balance which interest shall commence with the date first payment is due. Employee or his authorized representatives shall be allowed to prepay any such amounts in full, or in part, without penalty, provided that if paid only in part, that the monthly installments thereafter required shall not be reduced.

d. Employee agrees that he shall provide all records necessary to carry out the intent of this Agreement and shall report immediately to Employer when services have been provided a particular client.

6. Employee enters into this Agreement with full understanding of the nature and extent covered by the restrictive agreements contained in the immediately preceding paragraph, and Employee realizes that because of the unique nature of the business, this Agreement would not be entered into without the Agreements contained herein....

When the defendants left the firm to open their own office, plaintiffs sued for reimbursement. The trial court dismissed the complaint for failure to state sufficient facts upon which relief could be granted and further employed a Montana statute that held covenants not to compete to be in restraint of trade. *Id.* 708 P.2d at 579. The Montana Supreme Court reversed and sent the case' back for a decision and instructed the trial court to use the following rules in deciding if the above-described covenant was a reasonable restraint on the profession of public accounting:

1) The covenant should be limited in operation either as to time or place;

2) the covenant should be based on some good consideration;

3) the covenant should afford a reasonable protection for and not impose an unreasonable burden upon (a) the employer, (b) the employee, or (c) the public.

In *Miller v. Williams*, 300 So.2d 752 (Fla.Dist.Ct.App.1974), three accountants—Green, Priestor, and Miller—worked for Williams. Miller signed an agreement which stated, in part, that if Miller left Williams, and some of Miller's clients chose to follow him, Miller would pay to Williams one-third of any fees from those clients for three years. When Miller, Priestor, and Green left to open their own firm, Williams

sued to be reimbursed by all three. The Florida Court held the reimbursement was not in restraint of trade as to Miller only, as the other two had not signed such an agreement. The court made it clear that Miller owed Williams only for those clients acquired during the time period Miller worked for Williams. *Id.* at 757.

In *Isler v. Shuck,* 38 Or.App. 233, 589 P.2d 1180 (Or.Ct.App.1979), the defendant had signed a provision that if he left his employing firm, he would pay the firm fifty percent (50%) of gross fees earned from services performed in three years after termination for any clients of the firm who transferred their patronage to the departing accountant. He further agreed he would pay ten percent (10%) in gross fees earned from services performed in two years, after termination, for his own clients who continued their patronage with him. The court held the formula used was not a liquidated damage clause or a penalty clause. *Id.* 589 P.2d at 1182. In affirming, the trial court said, "A bad employment bargain does not become a restraint of trade because it is onerous. It must be shown to be an unreasonable limitation on the subject's right to engage in his calling." *Id.* While these other jurisdictions have found a reimbursement arrangement not to be in restraint of trade or a penalty, they have insisted the provisions be reasonable.

Likewise, Texas courts have also insisted that similar restrictive covenants—as usually found in employment contracts—be reasonable. Whether or not a generic restrictive covenant is reasonable has been addressed by the Texas Supreme Court in *Hill v. Mobile Auto Trim, Inc.,* 725 S.W.2d 168 (Tex.1987). Appellant insists this case is not applicable because it concerns a covenant against competition which is not present in the instant case. While we acknowledge this distinction, nevertheless the case is instructive as to reasonableness of contractual restraints generally as they deal with employment and earning a living. In *Hill,* the defendant (Hill) bought a franchise from Mobile Auto Trim. Hill signed a franchise contract that contained a covenant not to compete with Mobile or other

franchises if he lost his franchise. When Mobile tried to enforce the covenant with a temporary injunction, the trial court and appellate court upheld Mobile's position. The Supreme Court reversed and held the covenant was restrictive and had to be viewed in the light of its reasonable effect. *Id.* at 170. The following criteria were set to judge reasonableness:

1) The covenant must be necessary for the protection of the promisee;

2) The covenant must not be oppressive to the promisor;

3) The covenant must not be injurious to the public in preventing competition and depriving the community of needed goods;

4) The promisee must give consideration for something of value.

*Id.* at 170–71.

For its part, MH contends this instant case is controlled by *Henshaw v. Kroenecke,* 656 S.W.2d 416 (Tex.1983). While there are similarities, *Henshaw* is different but helpful in that it considers a covenant against competition that was combined with a liquidated damages clause. The Supreme Court said "An agreement not to compete is in restraint of trade and will not be enforced 'if it is greater than is required for the protection of the person for whose benefit the restraint is imposed or imposes undue hardship upon the person restricted.'" *Id.* at 418, citing *Weatherford Oil Tool Co. v. Campbell,* 161 Tex. 310, 340 S.W.2d 950, 951 (1960). The *Henshaw* court held the liquidated damages provision was reasonable and enforceable because it was a reasonable forecast of just compensation caused by the breach. *Id.*

In light then of the above described general rules, we turn to the case at hand. Upon analysis it is evident in this case, that the reimbursement covenant leaves much to be desired, especially in terms of identifying a firm client. We consider that part of the agreement which requires Haass to reimburse MH for clients who were patrons of MH on or before the date of termination reasonable. The evidence clearly shows MH expended signifi-

cant sums to acquire CJ's clients. MH has a right to protect itself and reap the benefits of its bargain. *See Henshaw v. Kroenecke,* 656 S.W.2d at 418. However, "client" is also defined as anyone who first deals with MH, even after Haass' departure, and then chooses to move its business to Haass; that is unreasonable. The definition is oppressive to the public interest and to the promisor. It would mean that Haass would have to, in effect, take a prospective client's accounting history. If he found a prospect who had been to MH in the two-year time span, Haass would either have to turn away business or pay MH his own earned fee. This is onerous as to Haass. Furthermore, the client would be restricted in his choice of an accountant. With a clause such as this one, it is conceivable that a person would have to contact more than one accountant to find one willing to pay the price exacted by MH. This is onerous to the public. It is also easy to recognize the shackles imposed on the promisor who simply changes jobs. This clause follows the accountant whereever he goes, for two years, and thus significantly interferes with the accountant's freedom of choice.

Therefore, we hold that MH has a right to reimbursement for those clients who were originally MH clients but who transferred their business directly and personally to Haass, from July 19, 1984 to July 18, 1986.

■■■ Further, to reiterate, by the agreement Haass is also responsible "for reimbursement to the firm for all direct costs (out of pocket expense), paid or to be paid by the firm in connection with the acquisition of such client including, without limitation, retirement benefit obligations of any predecessor firm." When MH and CJ merged, MH received the CJ client base as the principal asset. In return, MH pledged to pay retirement benefits and two outstanding CJ liabilities—the lease on the CJ office space and a promissory note. When

Haass left MH, the harm caused by his breach was an erosion of the existing client base. MH obviously relied on that client base and the future earnings it would produce to recoup the promised retirement benefits and the sums already expended to pay off CJ liabilities. In effect then, there is one harm—the partial loss of the CJ client base—and two damage provisions. This is onerous and unreasonable.

■■■ The right of competent parties to make their own bargain is not unlimited. *Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484, 486 (Tex.1952). The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained. *Id.* As noted above, the provision requiring Haass to pay earned fees for the clients who followed him is a reasonable forecast of the harm caused by his breach. It accurately reflects actual damages.

The second damage clause is not a reasonable forecast of just compensation for the harm caused by the breach. While the clause is not for liquidated damages, nevertheless, it operates as a penalty when construed in conjunction with the first provision. Trial testimony established that, in fact, MH designed the provision "to make a person 'think twice' before leaving MH." This is not reasonable in that it is oppressive to the promisor. *See Hill v. Mobile Auto Trim, Inc.,* 725 S.W.2d at 171. Further, it is in direct contradiction of the spirit of *Hill* which emphatically states that a person has a right to freely pursue his livelihood. *Id.* at 172.

■■■ Moreover, the clause lacks specificity as to terms. "Direct costs," and "out-of-pocket expenses," is not clearly defined. There are no instructions, in the agreement itself, that detail in what manner exact sums due would be calculated. The trial testimony alleged that Haass and Company had taken over twenty percent (20%) of the CJ client base.[2] In seeking these damages

---

2. William Sanders, a partner with Main Hurdman, explained the net acquisition cost to Main Hurdman resulting from the merger of Main Hurdman and Chorpening Jungmann. In determining the net acquisition cost, Sanders considered the following elements: (a) an assumption by Main Hurdman of the liabilities of Chorpening Jungmann as of July 31, 1983, one day

MH made no differentiation between Haass personally and the company which he helped organize and now operates in conjunction with others. Where, as here, a party seeks damages on a breach of an unreasonable restraint of trade, a restrictive covenant must stand or fall as written. *Weatherford Oil Tool Co. v. Campbell*, 161 Tex. 310, 340 S.W.2d 950 (1960). *See also Frankiewicz v. National Comp. Associates*, 633 S.W.2d 505 (Tex.1982). The acquisition cost provision operates as a restraint of trade and is unenforceable.

### *Attorney Fees*

 MH next complains that the trial court erred in refusing to order a remittitur on attorneys' fees. Although the amount of attorney fees is a question of fact for the jury, the trial or appellate court has the duty to reduce the fee awarded if it is excessive. *Argonaut Insurance Company v. ABC Steel Products Company, Inc.*, 582 S.W.2d 883, 889 (Tex.Civ.App. —Texarkana 1979, writ ref'd n.r.e.). Haass' counsel is entitled only to attorney fees based on the counterclaim. Counsel testified the flat fee for that countersuit would be about $15,000.00. We suggest a remittitur in the amount of $15,000.00.

In recapitulation, this court finds the following:

1. The client acquisition cost provision operates as a restraint of trade and is therefore unenforceable.

2. The client reimbursement provision is reasonable and this portion of the trial court's judgment is reversed and remanded for determination of MH's damages and attorney fees.

3. As the parties stipulated that should Haass prevail with his defenses he would receive his capital account, we affirm the judgment of the trial court awarding damages for the recovery of the capital account and attorney fees, subject to a filing of remittitur of attorney fees in the sum of $15,000.00 within fifteen (15) days of the entry of this judgment.

### APPENDIX

3. *Termination Other Than by Retirement—Payment to Firm*

(1) Any partner or principal who terminates or is involuntarily terminated, and in either situation is not entitled to any retirement benefits, and who, during the period of twenty-four months thereafter, solicits or furnishes accounting or related services to Firm clients shall compensate the Firm as hereinafter provided. Firm clients shall include any party who was a client of the Firm as of the termination date or became such a client during the twenty–four–(24)–month period thereafter, or any other party in which such clients are a principal party in interest. The foregoing includes servic-

---

prior to the merger; (b) total payments made by Main Hurdman to Alamo National Bank relating to Chorpening Jungmann's leasehold operations; (c) the cost of time and out-of-pocket expenses incurred by Main Hurdman partners to negotiate and finalize the merger agreement; (d) costs incurred for additional office space to accommodate Chorpening Jungmann personnel; and (e) the total amount of retirement and death benefits incurred by Main Hurdman as a result of the merger.

The total acquisition cost supposedly incurred by Main Hurdman resulting directly from the merger with Chorpening Jungmann was $4,284,-012.00. From this amount, $683,573.00 (representing the amount of acquired assets) was subtracted, which equals $3,600,439.00 (representing the net acquisition cost to Main Hurdman as a direct consequence of the merger of Main Hurdman and Chorpening Jungmann). To calculate the amount that would compensate Main Hurdman for the costs paid or to be paid by

Main Hurdman in connection with the acquisition of those clients who were later served by Haass & Company after August 20, 1984, a percentage was applied to the net acquisition costs incurred by Main Hurdman in the merger.

The percentage was determined as follows: the fees and charges to clients served by Chorpening Jungmann in 1982 who were served by Haass & Company after August 20, 1984 ($411,-044.00) was divided by the total amount of fees and charges to clients by Chorpening Jungmann in 1982 ($1,974,198.00); and this figure was multiplied by 100 to reach 20.82%. Therefore, it was established that the fees and charges to clients of Chorpening Jungmann that were served by Haass & Company after August 20, 1984 represented 20.82% of the entire fees and charges to Chorpening Jungmann clients in 1982. The net acquisition cost incurred by Main Hurdman was multiplied by 20.82% to determine the net cost.

es provided directly or indirectly, as an individual, partnership or corporation, engaged in the business of public accounting of any kind or character.

(2) In the event that any of the aforesaid clients are served, directly or indirectly as aforesaid, by such a terminated partner or principal (jointly and severally hereinafter referred to as "terminee"), such terminee shall be liable as follows:

(a) For payment in full of all fees and expenses, billed or unbilled, due to the Firm from such clients as of the date the Firm learns that the client will be served by the terminee or from the date such client notifies the Firm that it will be served by the terminee.

(b) For reimbursement to the Firm for all direct costs (out-of-pocket expense), paid or to be paid by the Firm in connection with the acquisition of such client including, without limitation, retirement benefit obligations of any predecessor firm.

(c) The aforementioned obligations shall be satisfied as follows:

(i) To the extent of the balance thereof, the amount so due shall be charged against the terminee's capital accounts as of the date of his termination.

(ii) Any balance then due shall be paid by the terminee remitting to the Firm all amounts received by him from such client. Such repayment shall be made within ten (10) days from the receipt of such funds.

(iii) If there is any balance still remaining by reason of the billed or unbilled fees and expenses owing by such clients, terminee agrees, on a best efforts basis, to assist the Firm in the collection thereof, including but not limited to full cooperation in a legal collection action. The out-of-pocket expense of any legal action shall be borne by the Firm but the terminee shall not be entitled to any compensation by reason of service so rendered by the terminee.

(iv) If there is any balance still remaining by reason of direct costs in connection with the acquisition of such clients,

payment of the amount due shall be made on receipt of the statement furnished as hereinafter provided.

(3) The Policy Board shall take such action as it may deem necessary or appropriate to implement the provisions of this Section, including but not limited to:

(a) Furnishing to the terminee statements setting forth the basis for the charges to the terminee's capital accounts and for any amounts due in excess thereof.

(b) Allocating the aforesaid obligations among the terminees if more than one is involved in serving such clients.

(4) The Policy Board shall have the right to waive any of the provisions of this Section 3 as it may deem necessary or appropriate in any situation.