**FIRST CITY NATIONAL BANK OF MIDLAND, Successor Independent Executor of the Estate of Boyd Laughlin, et al., Appellants,**

v.

**CONCORD OIL COMPANY, Appellee.**

No. 08–90–00233–CV.

Court of Appeals of Texas, El Paso.

March 13, 1991.

William B. Browder, Jr., Stubbeman, McRae, Sealy, Laughlin & Browder, Midland, for appellants.

Richard C. Danysh, Matthews & Branscomb, San Antonio, for appellee.

Before OSBORN, C.J., and WOODARD and KOEHLER, JJ.

## OPINION

KOEHLER, Justice.

In a case involving the interpretation of an assignment of two oil and gas leases which called for the termination of production payments when at a time in the future "there remains unproduced 10% of the commercially recoverable liquid and gaseous hydrocarbons in and under such tract[,]" the court held that the payments were to terminate when oil production produced after July 1, 1974 from the two leases equalled 84,366 barrels and 246,031.2 barrels, respectively. The court also awarded attorney's fees to Appellants. All parties appeal. We affirm.

Appellants, First City National Bank of Midland, Successor Independent Executor of the Estate of Boyd Laughlin; H.L. Brinson; Josephine Laughlin; Juanita Wyche, Independent Executor of the Estate of Charles D. Wyche; and Michael James Collins are either the original parties or the successors in interest of the parties as "Sellers," who on July 1, 1959, sold and assigned their right, title and interest in

twelve oil, gas and mineral leaseholds to Continental Investors, Inc., retaining and reserving to the Sellers certain production payments (Production Payment C or "PPC"), which were to commence and end as set forth in the assignment. Appellee, Concord Oil Company, is the successor in interest of Continental Investors. We are concerned here with the oil production in only two of the leases, designated respectively as the D.M. Womack Lease and the J.C. Womack Lease.

Under the assignment, the PPCs were not to commence until after other production payments, collectively called the Tobe Foster Production Payments A and B, had been discharged and terminated. After estimating the total reserves of oil remaining in all twelve tracts, the assignment provided in a subparagraph of paragraph IV.B:

Since it is possible that said Production Payment C may never become effective and since the parties intend that if it does become effective it shall not continue as to any tract for the duration of the econimic (sic) life of the lease covering such tract, when the Tobe Foster Production Payment has been retired, said parties, if they can do so by mutual agreement, shall determine, separately as to each of the 12 tracts shown on Exhibit A, the number of barrels of liquid hydrocarbons ... that thereafter can be commercially produced and saved from each of said 12 separate tracts. In the absence of such mutual agreement such determination shall be made in the manner set out immediately below.

The assignment then provided that the parties could either select a petroleum engineer by mutual agreement to make the determination of the number of barrels each tract could be expected to produce commercially or each select an engineer to make the determination. In the latter event, if the two engineers were unable to reach an agreement on the quantity of oil remaining to be produced commercially, they were to select a third engineer whose findings would be averaged with those of the first two to arrive at conclusive determinations for each tract.

In the next paragraph, the assignment provided:

From and after the time said initial redetermination of reserves has been made in the manner set forth above, Production Payment C, ... shall continue in effect until, ... the earliest occurrence of the following two alternatives, to-wit:

1. there remains in the ground and unproduced under said particular tract not less than 10% of the commercially recoverable reserves estimated in said initial redetermination to have been in and under said particular tract.

2. 15 years from the Effective Date. [July 1, 1959].

At that time there shall be one additional, which shall be the final, redetermination of reserves under said particular tract, which redetermination shall be made in accordance with the prodecure (sic) above set out for the making of said redetermination, and, from and after that time, said additional and final redetermination of reserves shall be controlling in so far as the continuance of Production Payment C as to said particular tract is concerned.

The assignment also provided that the PPC was to terminate as to each tract when there remained unproduced 10 percent of the oil in that tract, and the Sellers agreed to refund to Buyer any excess payments made after 10 percent of the reserves had been reached.

The Tobe Foster Production Payment on the two tracts terminated on or about July 1, 1969. However, following that termination, the parties did not make the initial redetermination regarding the number of barrels of commercially recoverable oil. Rather, in a letter agreement dated June 30, 1969, the parties agreed to waive the initial redetermination and to make a final redetermination sometime after July 1, 1974. The parties agree that a final redetermination was never made.

Appellee eventually brought this declaratory judgment action, requesting the court to declare the PPCs terminated as to the two tracts and for an accounting for proceeds received from April 30, 1984, or alter-

natively, for an order setting the procedure to be used by the parties to determine the quantities of oil which could be commercially produced, based on the data available in 1974 and 1975. Appellants answered and requested a declaratory judgment that the PPCs are still in force.

The trial court entered an order on August 17, 1989 which required the parties to try to establish by mutual agreement the number of barrels of oil that could be commercially produced from the two tracts during three separate time periods: commencing on July 1, 1974, on December 20, 1985, on August 17, 1989 and continuing during the remainder of the economic life of the lease on each tract. After reaching a determination as to the total reserves, the parties were ordered to subtract the actual production from each tract up to each of the three dates to determine the remaining reserves as of those respective dates. The order provided that if the parties could not mutually agree on a determination, they were to select a mutually agreeable petroleum engineer to make the determinations. Similar to the provisions in the assignment, if the parties could not agree on an engineer, they each were required to select an engineer. The two engineers were then to attempt to reach an agreement on determinations for the three time periods.

Two engineers were appointed by the parties and they (the engineers) agreed on the following determinations of gross oil reserves in barrels:

| Effective Date | D.M. Womack | J.C. Womack |
| --- | --- | --- |
| 7/1/74 | 93,740 | 273,368 |
| 12/20/85 | 45,394 | 132,526 |
| ·8/17/89 | 23,377 | 68,248 |

The court selected July 1, 1974 as the proper date to determine the reserves remaining and held in the March 22, 1990 judgment that the PPC had not yet terminated as to either tract but would terminate on D.M. Womack Lease when 84,366 barrels of oil had been produced from the reserve amount as of July 1, 1974 and would terminate on J.C. Womack Lease when 246,031.2 barrels had been produced from the reserve determined for the same date. Although Appellants agree that PPC has not terminated, they contend in four points of

error that the trial court erred (1) by its holding that PPC would terminate with respect to each tract when 90 percent of the reserves determined as of July 1, 1974 had been produced; (2) by failing to declare that PPC will not terminate as to each tract until a final determination is made that there remains unproduced 10 percent of the commercially recoverable oil; (3) by adopting July 1, 1974 as the final determination date; and (4) by failing to fix August 17, 1989 as the date for the final determination of the reserves in the two tracts. In two crosspoints, Appellee claims that the trial court erred by (1) failing to determine that the PPCs terminated on April 30, 1984 (sic), based on the testimony of Appellants' expert who had estimated in 1975 the oil reserves at two million barrels for the entire unit (which included the two Womack tracts) and on the day of the trial (February 21, 1989) estimated that 90 percent of the reserves in the two tracts had been extracted, and (2) awarding attorney's fees to Appellants.

◼ Although neither party believes the assignment or the letter agreement to be ambiguous, they disagree as to the construction of the assignment and the effect that the final redetermination has on the time when the PPCs terminate. A disagreement regarding the meaning of a clause in a contract does not render the clause ambiguous. *Medical Towers, Ltd. v. St. Luke's Episcopal Hospital,* 750 S.W.2d 820, 822 (Tex.App.—Houston [14th Dist.] 1988, writ denied). Appellants assert that the trial court erroneously declared July 1, 1974 to be the final determination date and would have us construe the assignment and letter agreement to mean that though a final determination is necessary, it should determine the commercially recoverable oil reserves on the date actually made. It is Appellants' position that if it is necessary to fix a date for final redetermination, it should be August 17, 1989 when the court issued its order, with a declaration that the PPCs are not to terminate until there remains 10 percent of the reserves determined as of that date. On the other hand, Appellee argues that the termination provisions of the assignment

mean the PPCs were to terminate upon depletion of 90 percent of the reserves as estimated in the initial redetermination which was to have been made at the time the payments commenced in 1969 (when the Tobe Foster payments terminated). It argues further that the final redetermination was to be utilized only for the purpose of determining whether the Sellers (Appellants) had been overpaid because the production turned out to be less than the reserves estimated in the initial redetermination. In the latter case, the Buyer (Appellee) would be entitled to a refund. We disagree with both positions.

When the parties disagree over the meaning of an unambiguous contract, the court must determine the parties' intent. *KMI Continental Offshore Production Co. v. ACF Petroleum Co.,* 746 S.W.2d 238, 241 (Tex.App.—Houston [1st Dist.] 1987, writ denied). In making this determination, the intent of the parties must be taken from the agreement itself, not from the parties' present interpretation, *Sun Oil Company (Delaware) v. Madeley,* 626 S.W.2d 726, 731, 732 (Tex. 1981), and the court must enforce an unambiguous contract as it is written. *Rutherford v. Randal,* 593 S.W.2d 949, 953 (Tex. 1980).

The construction of an unambiguous contract is a question of law for the court. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). In construing an unambiguous contract, a court should attempt to harmonize and give effect to all of its provisions so that none will be rendered meaningless. *Coker,* 650 S.W.2d at 393; *Eagle Life Insurance Company v. G.I.C. Insurance Company,* 697 S.W.2d 648, 651 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.).

Construing the assignment as a whole, the parties intended that a PPC would terminate when there remained unproduced not less than 10 percent of the reserves that existed on July 1, 1974. The final redetermination provisions were included to allow for any adjustment in the reserves determined by the initial determination that was warranted by later information. The parties by the July 30, 1969 letter agreement waived only the initial determination which was to have been made when the Tobe Foster Production Payments had terminated, not the final redetermination which, in effect, would become the only determination. By waiving the initial determination, they were in effect waiving the first of the two alternatives which would trigger the time to make the final redetermination. As a result of the waiver, the parties were agreeing that the PPCs would remain effective for fifteen years from July 1, 1959, the effective date of the assignment and although the final redetermination would be made at a future date, it would, when made, result in an estimate of the number of barrels of commercially producible oil remaining in reserve as of 1974. That estimate of the 1974 reserves, whenever made, would be controlling on the questions of what percentage of the reserves had been produced, and whether and how long the PPCs were to continue. The significance of the first alternative which required the PPCs to continue until there remained unproduced 10 percent of the commercially recoverable oil reserves estimated in the initial determination, and the second alternative which required the PPCs to continue until fifteen years from the effective date, is that whichever occurred first would bring about the necessity of making the final redetermination, not that either occurrence would mark the termination of the PPCs. In arriving at this conclusion, the trial court was not writing a new contract for the parties, but was merely enforcing the assignment as written, minus the requirement for an initial determination. The court was holding the parties to their commitment to make a final (re)determination as of 1974, even though they agreed that that redetermination could be put off to sometime after that date. With or without the waiver, it was the intention of the parties that the 10 percent remaining unproduced approach (or the 90 percent produced approach, which we view as establishing the same termination point) would be based on a definite reserve at a specific point in time. Appellants' Points of Error Nos. One, Two, Three and Four are overruled.

■ Under its Cross–Point of Error No. One, Appellee asserts that Appellants are estopped from denying the correctness of their 1975 reserve estimate of two million barrels which was not only communicated to Appellee's predecessor, but accepted and acted upon by it to its detriment, citing *Peat Marwick Main v. Haass*, 775 S.W.2d 698 (Tex.App.—San Antonio 1989, writ granted) which sets out the requirements of estoppel. One of the requirements of *Haass* is that there must exist a misrepresentation or concealment of material facts. There is no evidence of a material misrepresentation or that Appellee's predecessor relied on Appellants' 1975 estimate to its prejudice. Cross–Point of Error No. One is overruled.

■ In Cross–Point of Error No. Two, Appellee argues that the trial court erred by awarding $20,000.00 attorneys' fees to Appellants, plus additional fees in the event of appeals. Appellee asserts that the award of attorneys' fees to Appellants was improper "[b]ecause their claim for declaratory relief raised issues that were not already before the Court, ... (sic)." From the cases cited and the balance of Appellee's argument, we take it that Appellee meant to write that an award of attorneys' fees to a defendant in a declaratory judgment action is not proper where the defendant's answer, also seeking declaratory relief, only raises issues already before the court. It cites as authority for this proposition *John Chezik Buick Company v. Friendly Chevrolet Co.*, 749 S.W.2d 591 (Tex.App.—Dallas 1988, writ denied); *Narisi v. Legend Diversified Investments*, 715 S.W.2d 49 (Tex.App.—Dallas 1986, writ ref'd n.r.e.); *Johnson v. Hewitt*, 539 S.W.2d 239 (Tex.Civ.App.—Houston [1st Dist.] 1976, no writ); and *Joseph v. City of Ranger*, 188 S.W.2d 1013 (Tex.Civ.App.— Eastland 1945, writ ref'd w.o.m.). Its reliance is misplaced since none of these cases involve the fact situation where, as here, a plaintiff has filed an action for declaratory relief and attorney's fees and the defendant in his answer also seeks a declaratory judgment and attorney's fees. In *Buick*, Chevrolet sued Buick as a principal liable for a transaction entered into by its agent. Buick answered with a denial and counterclaimed for a judgment declaring that no agency existed. The Dallas Court of Appeals in holding that "the Declaratory Judgment Act is not available to settle disputes already pending before a court," said at 594, "In *Narisi* we recognized that a counterclaim under the Declaratory Judgment Act, presenting no new controversies but brought solely to pave an avenue to attorney fees, was not proper." In *Joseph* the court concluded that since the parties had joined issues upon all the questions in the suit and the court could proceed to trial upon all of those issues, a declaratory judgment would serve no useful purpose. 188 S.W.2d at 1015. In *Johnson*, the court held that the Declaratory Judgment Act could not be invoked to determine rights in a pending suit where the issues raised in the petition for declaratory relief are the same as those raised in the existing suit. 539 S.W.2d at 240–1. In our case, the pending suit brought by Appellee had invoked the Declaratory Judgment Act and asked for attorney's fees. By asking for declaratory relief different from that sought by Appellee, Appellants were joining issue and were entitled to request an award of attorney's fees. *United Interests, Inc. v. Brewington, Inc.*, 729 S.W.2d 897, 901, 906 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). See *Jennings v. Minco Technology Labs, Inc.*, 765 S.W.2d 497, 503 (Tex.App.—Austin 1989, writ denied). Moreover, even if Appellants had pled nothing more than a general denial with a request for attorney's fees, that would have been sufficient since, the Declaratory Judgment Act having been invoked by Appellee, the court in its discretion may award "reasonable and necessary attorney's fees as are equitable and just." Tex.Civ.Prac. & Rem.Code § 37.009 (Vernon 1986). Nothing is said or implied by the language of that section which would limit the award of attorney's fees only to the first, and perhaps only, party to invoke the Declaratory Judgment Act, *Ritchie v. City of Fort Worth*, 730 S.W.2d 448, 451 (Tex.App.—Fort Worth 1987, writ ref'd n.r.e.) or only to the prevailing party.

*First National Bank at Lubbock v. John E. Mitchell Company,* 727 S.W.2d 360, 363 (Tex.App.—Amarillo 1987, writ ref'd n.r.e.); *District Judges of Collin County v. Commissioners Court of Collin County,* 677 S.W.2d 743, 746 (Tex.App.—Dallas 1984, writ ref'd n.r.e.). Cross–Point of Error No. Two is overruled.

Since both parties appealed from the judgment of the trial court, we decline to award Appellants any additional attorneys' fees for the appeal. Judgment of the trial court is affirmed.