Robert C. **CALLAWAY** and Donna G. Callaway, Appellants,

v.

Dorothy **OVERHOLT** d/b/a Overholt Investments, Appellee.

3–89–052–CV.

Court of Appeals of Texas, Austin.

Sept. 19, 1990.

Rehearing Overruled Oct. 31, 1990.

Michael R. Zimmern, Grimes, Zimmern & Associates, Round Rock, for appellants.

Jennifer Tull, Weeks & Buford, Austin, for appellee.

Before POWERS, GAMMAGE and JONES, JJ.

POWERS, Justice.

Robert and Donna Callaway appeal from a judgment awarding Dorothy Overholt $40,000 for breach of contract together with $30,500 in attorney's fees, the former sum being based upon a directed verdict and the latter upon the jury's finding. We will affirm the judgment.

## THE CONTROVERSY

The Callaways owned and wished to sell certain real property and improvements constituting a motel. Overholt is a licensed real-estate broker. Through Overholt's efforts, the Callaways entered into a contract to sell the property to Charles H. Bridges and Robert B. Reese. The parties' promises to buy and sell were subject to several conditions precedent set out in the contract instrument, notably the approval of a certain national motel chain for continued affiliation of the motel and the buyers' obtaining a loan commitment for a substantial part of the purchase price.

Overholt was not a party to the contract of sale and purchase. The instrument declared in paragraph 7.02, however, that Overholt had "negotiated this sale and the Sellers [the Callaways] agreed to pay [her] the sum of [$40,000] as a sales commission upon the consummation of this sale."

By August 26, 1985, the date specified for consummating the contract, the parties' obligations and rights thereunder had become fixed and enforceable. That is to say, the contract was no longer subject to unilateral cancellation by reason of any condition expressed in the instrument. In the matter of enforcement, the contract gave the Callaways, if not in default themselves, an election to sue for recovery of specific performance, consequential damages, or liquidated damages equal to the earnest money paid by Bridges and Reese.

The parties did not consummate the contract on August 26, 1985. Rather, they canceled the contract by mutual agreement in a contract of settlement and compromise, signed August 28, 1985. In that contract, they released their respective claims, rights, and causes of action, Bridges and Reese paying the Callaways $2,500. Overholt was not a party to the contract of settlement and compromise.

On January 29, 1986, the Callaways entered into another contract to sell the property. The terms of the second contract were essentially the same as the first, with these exceptions: (1) Bridges remained a purchaser but Lawrence R. Price supplanted Reese; (2) the second contract omitted any reference to a broker's commission; and (3) the purchase price was reduced by $140,000, an amount equal to the sum of Overholt's commission ($40,000) specified in the first contract and the cost of repairs ($100,000) required by the national motel chain as a condition for continued affiliation. The parties subsequently consummated the second contract.

The Callaways declined to pay Overholt a commission on the transaction contemplated in either of the two contracts they had made for the sale of the property. Overholt thereupon sued them in the present cause. We need only consider Ov-

erholt's claim regarding the Callaways' contract with Bridges and Reese.

## THE TRIAL–COURT PROCEEDINGS

Overholt alleged in her petition that she procured the sale to Bridges and Reese and that the Callaways breached a contract to pay her a $40,000 commission for her services, for which she prayed. She did not allege whether the contract breached by the Callaways was express or implied.

The Callaways answered by general denial and a plea that paragraph 7.02 of their contract with Bridges and Reese imposed by its terms a *condition precedent* to any legal duty on their part to pay Overholt the $40,000 commission specified therein, even though Overholt was not a party to that contract. They contended therefore that their duty to pay the $40,000 arose only "upon the consummation of [the] sale," and because the first contract was never consummated, they had no duty to pay Overholt. They pled no special exception to Overholt's allegations.

No party alleged that paragraph 7.02 was ambiguous. At trial, no evidence was adduced as to any subjective meaning assigned the language of the paragraph by any contracting party. Mr. Callaway did testify that he refused to pay Overholt's commission under paragraph 7.02 because "the sale didn't go through" and she therefore "didn't have one coming." This is, of course, simply a restatement of his allegation that paragraph 7.02 amounted to a condition precedent.

At the conclusion of the evidence, the trial court sustained Overholt's motion for a directed verdict with respect to her claim for breach of contract and consequential damages equal to $40,000, leaving only the question of attorney's fees to be submitted to the jury. The jury returned a verdict in the amount of $30,500 for attorney's fees, and both sums were incorporated in a final judgment that we now review in an appeal by the Callaways.

## DISCUSSION AND HOLDINGS

The Callaways urge on appeal five points of error. All of them depend ultimately upon the issue of whether the trial court erred in directing a verdict for Overholt, for her $40,000 commission, at the close of the evidence. Under the pleadings and evidence, the directed verdict may be proper only on a theory of breach of contract proved by the evidence as a matter of law.

We must determine the Callaways' assignments of error within the context of two general rules: Where a contract provision is not ambiguous on its face, its construction is a question of law for the court alone, *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex.1968), and where the evidence is undisputed regarding a person's conduct under a contract, the court alone must determine whether it shows performance or breach of his contract obligation. *Crane v. Colonial Holding Corp.*, 57 S.W.2d 316, 319 (Tex.Civ.App.1933, no writ).

Concerning the contract for a commission between Overholt and the Callaways, Overholt did not oppose by pleading or evidence the Callaways' contention that paragraph 7.02 accurately reflected their agreement with Overholt regarding her commission. Indeed, Overholt's position is and was that it did, even though she was not a party to the contract of which paragraph 7.02 is a part.[1] Moreover, no party alleged or argued here or in the court below that paragraph 7.02 was ambiguous, nor did any party offer evidence of any

---

1. It appears to be undisputed that Overholt's claim arises out of an unwritten contract between herself and the Callaways to pay her a commission on a sale of the motel. A writing in that regard is required by the terms of Tex.Rev. Civ.Stat.Ann. art. 6573a, § 28 (1969). We note, however, that paragraph 7.02 of the contract between the Callaways, Bridges, and Reese, which the Callaways signed, amounts to a memorandum sufficient to satisfy the requirement of a writing because in paragraph 7.02 the Callaways acknowledged Overholt's services and agreed to pay her a $40,000 commission upon the consummation of the sale. *See Reeves v. Hall*, 437 S.W.2d 424, 427 (Tex.Civ.App.1969, no writ); *Bridwell v. Sandefur*, 341 S.W.2d 710, 712 (Tex.Civ.App.1960, writ dism'd). In any case, the Callaways do not contend to the contrary on appeal.

particular meaning they assigned to it. Evidently, all parties were content that the language should be construed as a matter of law as in the case of any unambiguous contract provision. Consistently with the parties' position, we hold paragraph 7.02 to be unambiguous on its face.

When the evidence closed, it was undisputed that Overholt procured Bridges and Reese as purchasers from the Callaways under a contract that had become enforceable by its terms, and that the parties to that contract had not consummated it on the date specified therein; that paragraph 7.02 of the contract between the Callaways and Bridges and Reese accurately reflected the terms of the Callaways' contract obligation to pay Overholt a commission, even though she was not a party to the contract of which paragraph 7.02 was a part; and that the Callaways refused to pay her a commission on the legal ground that paragraph 7.02 interposed consummation of their contract with Bridges and Reese as a condition precedent to their duty to do so.

In this state of the pleadings and undisputed evidence, only a question of law remained in order to determine Overholt's pleaded cause of action for breach of contract: Did paragraph 7.02, properly construed, interpose the condition precedent for which the Callaways contended? The trial court concluded it did not and gave judgment accordingly. We believe the trial court did not err in its construction of paragraph 7.02.

■ A broker's legal right to a commission must arise from a contract, ordinarily his contract with the seller of real property.[2] The contract between broker and seller may be implied, in fact or in law, or it may be express. Unless the parties expressly contract otherwise, the broker is entitled to a commission *at the time* he procures a buyer ready, willing, and able to make an enforceable contract to purchase the seller's property on terms acceptable to him. If an enforceable contract results between buyer and seller, the latter necessarily accepts the former's readiness, willingness, and ability to perform; therefore, the fact that the contract is never carried out does not defeat the broker's legal right to a commission. *Air Conditioning, Inc. v. Harrison–Wilson–Pearson*, 151 Tex. 635, 253 S.W.2d 422 (1952); *Loma Vista Dev. Co. v. Johnson*, 142 Tex. 686, 180 S.W.2d 922 (1944); *Hutchings v. Slemons*, 141 Tex. 448, 174 S.W.2d 487 (1943); *Stevens v. Karr*, 119 Tex. 479, 33 S.W.2d 725 (1930); Restatement (Second) of the Law of Agency § 445 comment d, at 348 (1958). As indicated, these rules apply in the case of implied contracts or in an express contract where there is no special agreement to the contrary regarding whether and when the broker's commission shall be legally due and payable.

■ The broker and seller may vary by express agreement the usages and rules applicable to implied contracts. They may contract, for example, that the broker's legal right to a commission shall be contingent upon an actual "sale" of the property in the sense of a conveyance of legal title in exchange for payment of the purchase price. *See generally* 10 Jaeger, Williston on Contracts § 1287, at 957–63 (1967); Annotation, *Recovery of Real Estate Commissions*, 12 A.L.R. 4th 1083 (1983). In *Parker v. Outhier*, 209 S.W.2d 759 (Tex. 1948), for example, the contract between buyer and seller, signed as well by the broker, "recognized" the broker's negotiation of the transaction but declared only that "the seller shall pay him the regular five per cent commission." The seller was

---

**2.** Such express contracts between seller and broker often take the form of a "listing agreement," a contract between them in which the seller "lists" his property with a broker to whom the seller gives some scope of authority relative to the negotiation of a sale with potential buyers. *Padre Sands, Inc. v. Cawood*, 595 S.W.2d 896, 899 (Tex.Civ.App.1980, writ ref'd n.r.e.). The broker's authority to negotiate a sale of the property may or may not be exclusive. *See*

Annotation, *Exclusive Listing Agreement—Commission*, 69 A.L.R.3d 1270 (1976). The amount of commission may vary in such contracts, and the contract may be unilateral or bilateral or vary in other respects regarding the parties' mutual promises and representations. In any event, there is no magic in the term "listing agreement"; it is simply a contract between seller and broker of the kind described.

permitted to adduce evidence, however, that the broker's commission was the subject of an express "verbal" contract wherein the seller specially agreed with the broker that his commission would be contingent upon delivery of a deed in exchange for the purchase price. While this evidence of a special agreement varied the usage associated with implied contracts, it did not vary the terms of the written contract between the parties because that writing was "silent regarding this issue." Hence, the parol evidence rule did not preclude receiving evidence of the special agreement and submitting the issue to the jury. *Parker,* 209 S.W.2d at 761.

In the present case, the Callaways conceivably might have introduced similar evidence but did not do so, being content to defend solely upon the meaning they assign to paragraph 7.02—that it imposed the identical condition precedent *as a matter of law,* that is to say, by its very terms properly construed. We agree that the question is one of law, but we reject on several grounds the meaning the Callaways impute to paragraph 7.02, which declares simply that Overholt "has negotiated this sale," and that the Callaways "agreed to pay" her $40,000 "as a sales commission upon the consummation of this sale."

■ It is possible, of course, as the Callaways contend, that they employed Overholt to procure not merely an enforceable contract for the sale of their motel but an actual "sale" of the property in the sense of an exchange of the purchase price for a conveyance of legal title to the property. However, the sense of the expressions used in paragraph 7.02 affirmatively *negates* the theory that Overholt and the Callaways contracted for a commission on that basis. The ordinary sense of the paragraph implies that Overholt *had* performed all that was required of her under her contract with the Callaways; and the expression "this sale," implies that the "sale" consisted in the Callaways' executory contract with Bridges and Reese. Unless it clearly appears to the contrary (which is not the case here), a provision of this kind evidences the seller's acknowledgment that

the broker has earned his commission and that the seller legally owes it to him, the word "sale" being held to mean the transfer of the seller's equitable title in consideration of the purchaser's enforceable promise to pay the purchase price. *Sanderson v. Wellsford,* 53 Tex.Civ.App. 637, 116 S.W. 382, 384–85 (1909, no writ).

■ No evidence adduced in the case takes the case out of the general rule: In the absence of a showing that the seller and broker have made a special agreement to the contrary, provisions like paragraph 7.02 modify not the broker's legal entitlement to a commission, for having procured an enforceable contract for the seller and the seller's legal obligation to pay such commission, but rather the *time* the broker's commission shall be payable, so that it is payable not on the procuring of such a contract but upon its consummation. *Peters v. Coleman,* 263 S.W.2d 639, 643 (Tex. Civ.App.1954, writ ref'd n.r.e.); *Caneer v. Martin,* 238 S.W.2d 828, 830 (Tex.Civ.App. 1951, writ dism'd); *Lattimore v. George J. Mellina & Co.,* 195 S.W.2d 250, 251 (Tex. Civ.App.1946, no writ). The present record contains no pleading or evidence of the parties' intention that would take the case out of this ordinary rule.

■ In all events, the very language of paragraph 7.02 will not permit an inference that it was intended by the parties to impose consummation of the sales contract as a "condition precedent" to the Callaways' legal duty to pay, or Overholt's legal entitlement to, a commission. No particular words are necessary to impose a condition upon a contract obligation or right. They are denoted ordinarily by such expressions as "if," "provided that," "on condition that," or some like phrase or word. *Hohenberg Bros. Co. v. George E. Gibbons & Co.,* 537 S.W.2d 1, 3 (Tex.1976). Outside paragraph 7.02, for example, the contracting parties imposed such conditions when they provided that the Callaways might unilaterally cancel the contract "if" the national motel chain did not approve continued affiliation by a specified date; or that Bridges and Reese might do so "if" they did not receive acceptable financing before July 15, 1985 or "in the event" the Callaways did not cure title defects.

Paragraph 7.02 does not contain any like words or phrases from which one might infer that the Callaways' legal duty to pay a commission did not arise *unless* the contract was consummated. Even if it were possible to impute that element of contingency to the language of the paragraph, the only consequence would be to create a doubt about what the parties intended—the language still implies, as in the ordinary case, the contrary meaning that it refers only to *when* the commission shall be due and payable. In these circumstances, the trial court was *legally required* to prefer the latter meaning and construe paragraph 7.02 as providing for a *covenant* to pay Overholt's commission at a specified time ("upon the consummation of this sale") rather than a *condition precedent* to her legal entitlement to the commission and the Callaways' legal duty to pay it. *Hohenberg Bros.*, 537 S.W.2d at 3; *Schwarz–Jordan, Inc. v. Delisle Const. Co.*, 569 S.W.2d 878, 881 (Tex.1978).

Because the judgment is sustainable on the legal grounds given above, we need not reach the Callaways' points of error complaining that the judgment is erroneous as resting upon their second contract with Bridges and Price. We affirm the judgment of the trial court.