TNA v. Locke 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-91-568-CV





TEXAS NATIONAL AGENCY, INC.,



 APPELLANT


vs.





PATRICK CHARLES LOCKE,



 APPELLEE



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT



NO. 436,043, HONORABLE JOE B. DIBRELL, JUDGE PRESIDING



 


 Texas National Agency, Inc. ("TNA") sued Patrick Charles Locke, a former
employee, for breach of two separate postemployment agreements: (1) a debt-payout agreement
and (2) an agreement to split commissions with TNA on a particular insurance account. The
district court, ruling against TNA on the debt-payout agreement, awarded damages to Locke on
his counterclaim against TNA for violations of article 21.21 of the Texas Insurance Code. 
However, the district court ruled against Locke on the commission-split agreement and awarded
TNA compensation for the commissions. The parties challenge the respective damage awards
assessed against them. We will reverse in part and affirm in part.



THE CONTROVERSY



 Locke went to work in 1982 as an insurance salesman for TNA, a general
independent insurance agency. Under Locke's employment contract, he was to receive an annual
salary of $12,000, as well as advances against expected commissions. Commissions generated
from accounts Locke produced would be used to offset these advances, or "draws." The contract
provided that, should Locke's employment terminate, Locke would have to reimburse TNA for
any amount by which the draws exceeded the commissions earned.

 When Locke ended his employment with TNA in 1984, the draws he had received
exceeded his generated commissions by about $30,000. Although that sum was due immediately
under the employment contract, TNA and Locke entered into a payout arrangement (the "draw-balance agreement"). The parties agreed that a percentage of the commissions generated from
accounts Locke had produced while an employee of TNA would be credited against the draw
balance. Hence, as long as former Locke accounts produced commissions, the draw balance
would diminish. Under this agreement, credits from commissions gradually reduced the draw
balance over the course of the next few years. 

 In November 1987, however, the parties' dispute concerning the commission-split
agreement disrupted the discharge of the draw balance. The commission-split agreement arose
in February 1985 when Bill Hertel, a TNA employee, contacted Locke to ask if Locke could place
an account for the Jagger-Buzbee Company. At this time, Locke was working for Nationwide
Insurance Company. Locke agreed to place the account if Hertel would gather and furnish
necessary information, which Hertel did. At the time of their initial discussion, Locke and Hertel
agreed to split commissions on the Jagger-Buzbee account, sixty percent to TNA and forty percent
to Nationwide.

 In May 1985, Locke confirmed the commission-split agreement by letter to Hertel,
stating that TNA would receive 60 percent of commissions on "new and renewal," meaning that
the agreement would continue when the Jagger-Buzbee Company renewed the original policies. 
The original policies were issued for three years, beginning March 1, 1985. Locke, however,
ceased splitting commissions on April 1, 1987, the date the Jagger-Buzbee Company divided to
become two new and separate businesses. Although the Jagger-Buzbee Company divided in April,
the insurance policies issued on the account were not canceled until November 1987. 

 Once Locke ceased splitting commissions on the Jagger-Buzbee account, TNA
stopped crediting Locke's draw balance with commissions produced by former Locke accounts. 
TNA sent demand letters to Locke representing that all Locke's former accounts had ceased
producing commissions and that the remaining draw balance was therefore due in full. TNA then
sued Locke to recover (1) the remainder due under the draw-balance agreement and (2) its share
of the Jagger-Buzbee commissions. Locke counterclaimed under Tex. Ins. Code Ann. art. 21.21
(West Supp. 1993), alleging that TNA had fraudulently misrepresented that former Locke
accounts were no longer generating commissions to be credited against the draw balance. 

 At the close of TNA's case-in-chief, the district court directed a verdict against
TNA on its claim for damages under the draw-balance agreement. The court concluded that the
draw-balance agreement had not been breached but was still in effect, and that TNA was required
to continue crediting commissions against the draw balance as long as any former Locke accounts
were still generating commissions. The evidence showed that at least one Locke account, the
OEM account, was still producing commissions.

 After holding that the draw-balance agreement remained in force, the court allowed
Locke to go forward with his counterclaim. The jury returned a verdict awarding Locke treble
damages of $11,970 and attorney's fees of $20,457.50, for a total of $32,427.50. With respect
to the commission-split agreement, the jury found that TNA and Locke had not agreed to split
commissions on insurance business after the break-up of the Jagger-Buzbee Company. Based on
the jury's findings, the court rendered judgment for Locke on the damages and attorney's fees
award; however, the court disregarded the jury's finding that the agreement to split commissions
terminated after the division of Jagger-Buzbee. The court then ordered TNA to give Locke an
accounting for commissions to be credited against the draw balance and ordered Locke to account
to TNA for Jagger-Buzbee commissions earned on those policies until their cancellation. 

 As a result of the accounting, the draw balance "zeroed out," with Locke owing
nothing further on the payout agreement. Under the commission split, however, Locke was found
to owe TNA $11,180.21. Both TNA and Locke appeal the awards against them.

DISCUSSION


TNA's Challenge of the Damages Award

 TNA advances two points of error. In the first, TNA claims the trial court erred
in awarding Locke treble damages and attorney's fees because there is no evidence to support the
jury's finding that Locke sustained actual damages. In deciding a no-evidence point, we must
consider only the evidence and inferences tending to support the finding of the trier of fact and
disregard all evidence and inferences to the contrary. Alm v. Aluminum Co. of Am., 717 S.W.2d
588, 593 (Tex. 1986), cert. denied, 111 S. Ct. 135 (1990); Garza v. Alviar, 395 S.W.2d 821, 823
(Tex. 1965); see generally William Powers, Jr. & Jack Ratliff, Another Look at "No Evidence"
and "Insufficient Evidence", 69 Tex. L. Rev. 515 (1991); Michol O'Connor, Appealing Jury
Findings, 12 Hous. L. Rev. 65 (1974).

 The record shows that TNA and Locke agreed that commissions from former Locke
accounts would serve to discharge Locke's debt for the draws for as long as those accounts
continued to produce commissions. The district court ruled in its directed verdict that the draw-balance agreement continued in effect because the OEM account continued to produce
commissions. The court-ordered accounting forced TNA to apply the accrued credits from the
OEM account to the draw balance, thereby eliminating Locke's debt. Hence, the district court's
final judgment freed Locke from having to pay any monies to TNA to discharge the draw balance.

 Although Locke ultimately received full credit for the OEM commissions that TNA
had refused to credit against the draw balance, he nevertheless contends that he suffered damage
from TNA's misrepresentations that no former Locke accounts continued to generate
commissions. Locke cites the testimony of Randy Teich, an employee of TNA, as support for
the actual damages award. Teich conceded that TNA had failed to apply to the draw balance a
$3,990 credit generated by the OEM account. (1) Teich's testimony, however, does not establish
that Locke sustained actual damages.

 Whether TNA properly credited Locke's draw balance could only have an actual
impact if the draw-balance agreement were terminated because only then would Locke be required
to pay any outstanding balance. Due to the district court's ruling that the draw-balance agreement
remained in effect, Locke never had to pay $3,990 or any other sum to TNA on the draw debt. 
Therefore, TNA's refusal to credit the draw balance, irrespective of any underlying motive,
inflicted no actual loss on Locke.

 Locke relies on Leal v. Furniture Barn, Inc., 571 S.W.2d 864 (Tex. 1978), to
support his contention that he has suffered harm. In Leal, a retailer claimed contractual rights it
did not possess, namely, that if the buyer under a "layaway" contract discontinued payments, the
monies already paid would be forfeited. The buyers brought suit under the Deceptive Trade
Practices Act and were awarded actual damages of $185, treble damages, and attorney's fees. 
Leal is distinguishable from the instant case because the buyers had actually paid $185 to the
defendant -- $175 as a down payment on furniture purchased on layaway and an additional $10
subsequently tendered and accepted. Here, by contrast, Locke made no out-of-pocket payment
to TNA nor was he ever required to do so. TNA's refusal to credit the draw balance caused
Locke no actual loss under the rulings of the trial court.

 A fundamental purpose of all rules of damages, other than punitive damages, is to
indemnify an injured party for the pecuniary loss suffered, placing him as nearly as possible in
the position he would have occupied but for the injury in question. Waldon v. Williams, 760
S.W.2d 833, 834 (Tex. App.--Austin 1988, no writ). The accounting ordered by the district court
put Locke in the same position he would have occupied had TNA not withheld the credits
produced by the OEM account. Consequently, the jury's award of $3,990 in actual damages was
unnecessary to make Locke whole. A party receiving a credit in the form of an offset on a debt
cannot properly be awarded the same amount again by way of damages. See Beeman v. Worrell,
612 S.W.2d 953, 959 (Tex. Civ. App.--Dallas 1981, no writ).

 Concluding that no evidence exists that Locke suffered actual damages, we sustain
TNA's first point of error. When no actual damages exist, there is no basis for an award of
enhanced damages or attorney's fees. See Tex. Ins. Code Ann. art. 21.21, § 16(a), (b)(1) (West
Supp. 1993); Beeman, 612 S.W.2d at 959. Because we conclude there can be no recovery
pursuant to Locke's counterclaim, we need not decide the issue presented by TNA's second point
of error: whether article 21.21 furnishes Locke a cause of action on the facts of this case. 


Locke's Cross-Appeal


 Locke's cross-appeal seeks to overturn the trial court's award of $11,180.21 to
TNA for Jagger-Buzbee commissions. By a single cross-point, Locke claims that the trial court
erred in disregarding a jury finding because there is sufficient evidence to support that finding. 
Jury Question One asked whether TNA and Locke had agreed to split commissions on the
insurance business of the Jagger Companies or Robert Buzbee & Associates after the division of
the Jagger-Buzbee Company. The jury answered "No." The judgment recites that the court
disregarded this finding because it "found as a matter of law that the reasonable term of the
original [commission-split] agreement . . . should end November 4, 1987," the day that the
original Jagger-Buzbee policies were canceled.

 Locke contends that the $11,180 award to TNA is based upon the court's decision
to disregard the jury finding. Locke's argument apparently stands on the erroneous belief that the
division of the Jagger-Buzbee Company into two new and separate companies ended the
commission-split agreement, and, therefore, no commissions accruing after the date of division
were subject to splitting. However, the judgment reveals that the award stems from the court's
ruling as a matter of law that the original agreement continued in effect until November 1987. 
Because the parties disputed neither the existence of the commission-split agreement nor its terms,
the construction of the agreement was properly a question for the trial court. See Callaway v.
Overholt, 796 S.W.2d 828, 831 (Tex. App.--Austin 1990, writ denied).

 Based on our review of the undisputed evidence bearing on the duration of the
original commission-split agreement, we hold the trial court's ruling was proper. Locke's May
1985 letter to Hertel commemorating the commission-split agreement states, "[Y]our agency
[TNA] will receive 60% of commissions on new and renewal." At trial, Locke explained the
meaning of this statement:

 Q: What do you mean by "new and renewal?" You're going to pay 60
percent to Texas National Agency on new and renewal? What did that mean?


 A: That meant that when the account renewed, that I would continue the
agreement.


 Q: All right. The original policies were issued for what period of time?


 A: For a three-year period of time.


(emphasis added). Locke's letter and his testimony unambiguously reveal that the parties agreed
to split commissions throughout the three-year term of the original policies issued on the Jagger-Buzbee account. Locke further testified that those policies were not canceled until November
1987. Although Jagger-Buzbee split into two separate companies in April 1987, the new
companies remained covered by the original insurance policies until those policies expired in
November 1987. Therefore, the trial court properly ruled that Locke should account to TNA for
commissions accrued on those policies between April and November 1987. Moreover, whether
TNA and Locke agreed to split commissions on insurance business of the two new companies
after November 1987 has no relevance to the award based on the original agreement. Thus, any
error in disregarding the jury finding is harmless.

 By further argument under his cross-point, Locke maintains he was free to
terminate the commission-split agreement because the agreement had no termination provision or
date and was therefore terminable at will. Locke cites Clear Lake City Water Authority v. Clear
Lake Utilities Co., 549 S.W.2d 385, 390 (Tex. 1977), for the proposition that "contracts which
contemplate continuing performance (or successive performances) and which are indefinite in
duration can be terminated at the will of either party." However, when the duration of a contract
is not expressly dictated by the agreement, courts will frequently presume that the parties intended
that the agreement should continue for a reasonable time. Clear Lake City Water Auth., 549
S.W.2d at 391; Marshall v. Marshall, 735 S.W.2d 587, 592 (Tex. App.--Dallas 1987, writ ref'd
n.r.e.). Furthermore, when it appears from the intrinsic nature of the agreement that the
agreement is necessarily limited as to duration by the happening of any one of several
contingencies, this ascertainable contingency determines the duration. Marshall, 735 S.W.2d at
592; see also Brittian v. General Tel. Co., 533 S.W.2d 886, 891 (Tex. Civ. App.--Fort Worth
1976, writ dism'd w.o.j.).

 Here, the intrinsic nature of the commission-split agreement linked its duration to
that of the underlying insurance policies for the Jagger-Buzbee account. Because the expiration
date of those original policies was readily ascertainable, so too was the duration of the
commission-split agreement. Therefore, Locke was not free to terminate the agreement at will
during the lifespan of the original policies. Though the policy-holders could shorten the duration
of the commission-split agreement by canceling those policies, Locke could not.

 Finally, we note that the trial court was correct in determining the duration of the
commission-split agreement as a matter of law, since there were no questions of fact to be
resolved by the jury. When the evidence is undisputed regarding a person's conduct under a
contract, the court alone must determine whether the conduct shows performance or breach of his
contractual obligation. Callaway, 796 S.W.2d at 831. Because the only disputed issue
concerning the commission-split agreement related to its applicability to the insurance business
of the two new companies, the trial court correctly resolved the remaining issues as a matter of
law. Locke's cross-point is overruled.


CONCLUSION



 For the foregoing reasons, we reverse that portion of the district-court judgment
awarding Locke damages on his counterclaim and render judgment that Locke take nothing. We
affirm that portion of the judgment awarding TNA $11,180.21 for its share of the Jagger-Buzbee
commissions.


 

 Bea Ann Smith, Justice

[Before Justices Powers, Aboussie and B. A. Smith]

Affirmed in Part; Reversed and Rendered in Part

Filed: December 23, 1992

[Do Not Publish]
1. The sum of $3,990 formed the basis for the jury's treble damage award of $11,970 and
supported the award of attorney's fees pursuant to art. 21.21, § 16(b)(1).