LONE STAR GAS COMPANY, a DIVISION OF ENSERCH CORPORATION, Appellant,

v.

MEXIA OIL & GAS, INC. and Reita Production, Inc., f/k/a Reita Oil Company, Inc., a/k/a Reita Oil, Inc., Appellees.

No. 05–91–00683–CV.

Court of Appeals of Texas, Dallas.

May 11, 1992.

Randall C. Grasso, Dan R. Byrd, Dallas, for appellant.

Don E. Williams, Dallas, for appellees.

Before BAKER, THOMAS and BURNETT, JJ.

## OPINION

THOMAS, Justice.

Lone Star Gas Company appeals from a take-nothing judgment in its suit against Reita Production, Inc. and Mexia Oil and Gas, Inc., Reita's successor in interest under a gas-purchase agreement (the contract). In four points of error, Lone Star argues that the evidence establishes as a matter of law that Mexia assumed Reita's contractual obligation to indemnify Lone Star for taxes paid on Reita's behalf. We disagree. Accordingly, we overrule all points of error and affirm the trial court's judgment.

## FACTUAL BACKGROUND

Lone Star and Reita entered into the contract in October 1981. Lone Star agreed to buy and Reita agreed to sell natural gas produced from the Edwards # 1–D Well in Jack County. According to the contract, Reita was to pay state severance taxes on the gas delivered under the contract before delivery. Lone Star then was required to reimburse Reita for 100 percent of the taxes. Further, the contract provided that Reita would indemnify and hold Lone Star harmless in this respect.

Reita contacted Lone Star in early 1982 and asked that Lone Star pay the taxes on production directly rather than having Reita pay and then be reimbursed. By letter dated May 3, 1982, Lone Star sent Reita a division order (the Reita division order) to be effective for deliveries beginning April 1, 1982. The Reita division order provided that Lone Star would pay Reita 100 percent of production less gross production (severance) taxes. The division order's cover letter further provided that Reita was responsible for taxes from initial deliveries through March 1982.

In November 1982, Mexia notified Lone Star that it had purchased all of the Reita/Quadco[1] interest and that it had taken over as operator of the Edwards Well. At Lone Star's request, Mexia forwarded various documents, including a copy of an assignment from Quadco to Mexia of lease interests and overriding royalty interests.[2] The assignment was effective September 1, 1982. Lone Star then sent Mexia a division order (the Mexia division order), effective October 1, 1982, which provided for payment to Mexia of 100 percent of production less gross production taxes. The Mexia division order further ratified the original contract and its amendments.

---

1. Quadco, a partnership, was the assignee of an oil, gas, and mineral lease on the subject tract. The natural gas produced from the Edwards Well and the tract was sold under the contract between Reita, as operator of the well, and Lone Star.

2. Mexia also included copies of a Texas Railroad Commission Form P–4 showing that the operator of the Edwards Well had changed from Reita to Mexia; an operator's certificate and closing agreement executed by Reita, Mexia, and Quadco; and a release of lien from a bank to Quadco. These documents do not refer to the contract at issue.

In 1985, the Texas Comptroller's Office notified Lone Star that Reita had failed to pay the taxes due on production for the months of January, February, and March 1982. Even though Lone Star had previously reimbursed Reita for these taxes, Lone Star paid the State $20,431.86 in taxes and interest.

Lone Star then requested that Mexia pay it the $20,431.86. While acknowledging that Mexia was not the operator during the period for which the taxes were due, Lone Star demanded payment from Mexia on the basis that Mexia was the current seller under the gas contract. In response to Lone Star's demand, Mexia billed all owners of interest in the lease for their pro rata portion of the taxes and interest. Mexia collected $10,215.93 and sent this sum to Lone Star.

Lone Star sued Reita and Mexia, alleging that Reita, as the original seller, and Mexia, as successor under the contract, were obligated to reimburse Lone Star for the taxes. Reita never was served with process. The trial court rendered a take-nothing judgment against Lone Star.

## MEXIA'S LIABILITY TO LONE STAR

In four points of error, Lone Star contends that the evidence established as a matter of law that Mexia assumed Reita's contractual obligation to indemnify Lone Star for the taxes. Thus, Lone Star contests the trial court's findings of fact and conclusions of law that:

(1) no evidence established that Mexia retroactively assumed Reita's liabilities incurred before the assignment;

(2) Mexia is not liable to Lone Star for reimbursement of the taxes;

(3) Reita is solely liable to Lone Star, if at all, under the terms of the contract for reimbursement of the taxes for January through March 1982; and

(4) Mexia was only prospectively bound by the terms of Reita's gas-purchase agreement with Lone Star after September 2, 1982.

Lone Star argues that Mexia's assignment was made "subject to" the contract and that the Mexia division order "adopted, ratified, confirmed and authorized" the contract. In addition, the contract itself extended its covenants to the parties' assigns and made them covenants running with the land. Because Mexia was bound to the contract, Lone Star asserts that Mexia should be liable under the contract's indemnity obligation. To determine Mexia's liability, we examine whether Mexia expressly or impliedly assumed the obligation.

### A. Express Assumption

Mexia signed two documents that referred to the contract. The first was the assignment from Quadco to Mexia. The assignment stated that it was "subject to" the gas-purchase contract between Reita and Lone Star. This provision alone, however, does not obligate Mexia to pay the prior debt of Reita. The acceptance of an assignment "subject to" a specified claim of a third person is not an implied promise by the assignee to pay that claim. There must be some express promissory words, or words of "assumption," on the part of the assignee. 4 A. CORBIN, CORBIN ON CONTRACTS § 906, at 632 n. 1 (1951); *see also Clark v. Scott*, 212 S.W. 728, 732–33 (Tex. Civ.App.—Dallas 1919, no writ) (mortgage). The assignment did not contain such express promissory words, even though the contract between Reita and Lone Star required that any assignment by the seller contain a provision obligating the assignee to perform the seller's obligations under the contract.

Mexia also signed a division order which provided that the contract and amendments, "in so far as applicable," controlled the purchase and sale of gas between Mexia and Lone Star. Thus, Mexia was bound to the contract only to the extent that the contract applied to the sale between Mexia and Lone Star.

Under the contract between Reita and Lone Star, the parties agreed that:

(1) Reita would pay, or cause to be paid, all taxes and assessments lawfully levied and imposed on Reita with respect to the gas delivered under the contract prior to its delivery to Lone Star;

(2) Lone Star would pay to Reita, by way of reimbursement, a sum sufficient to cover all of Reita's severance tax liability to the State;

(3) Reita would make all reports of applicable gross production (severance) taxes and would pay all such taxes;

(4) Reita would indemnify and save Lone Star harmless with respect to the payments of gross production taxes.

Effective April 1, 1982, the Reita division order amended the contract to provide that Lone Star would pay Reita 100 percent of production less gross production taxes. The contract thus no longer required the seller to pay, and subsequently to be reimbursed for, taxes. The cover letter accompanying the Reita division order stated: "Reita will be responsible for taxes from initial deliveries through March 1982." This statement indicates that Lone Star, at the time it made the change, had specifically indicated that "Reita" would be obligated to pay the taxes through March 1982.

The Mexia division order continued this same method of paying the seller 100 percent of production less gross production taxes. There was no evidence that the parties ever discussed or used a payment method that involved tax reimbursement—which was the essence of the provisions in the contract. Thus, when Mexia signed the division order ratifying the contract, the provisions relative to "reimbursement for taxes," including the indemnity obligation, did not apply to the sale of gas between Mexia and Lone Star. We conclude that Mexia did not expressly assume this obligation.

*B. Implied Assumption*

1. Covenant Running With the Land

Lone Star argues that certain provisions of the contract extend the covenants and terms to the successors and assigns of the parties and make them covenants running with the land. Thus, even without an express assumption of obligation, Mexia would impliedly assume the contractual obligations, including the indemnification clause. *See, e.g., Pierce Fordyce Oil Ass'n v. Woodrum,* 188 S.W. 245, 252 (Tex.Civ.App.—Fort Worth 1916, no writ) (op. on reh'g).

■ Even assuming that the indemnity provision survived the division-order amendments as a covenant running with the land, Lone Star's claim still would fail on this ground. Privity of estate is the foundation of the assignee's liability on covenants that run with the land. Thus, the assignee is not liable for breaches that took place before the assignment to him. *Stout v. Blackwell Oil & Gas Co.,* 183 Okl. 247, 80 P.2d 942, 943 (1938); *see also Washington Natural Gas Co. v. Johnson,* 123 Pa. 576, 16 A. 799, 800 (1889) (assignee liable for covenants maturing while title held by him but not liable for those previously broken). Mexia, then, is not liable to indemnify Lone Star for Reita's breach of contract in failing to pay the taxes, because that breach occurred before the assignment.

2. Cum Onere

Lone Star also claims an implied assumption because Mexia took the benefits of the gas contract *cum onere*—that is, Mexia inherited the burdens as well as the benefits imposed by the contract. In support of this argument, Lone Star relies on *Kirby Lumber Co. v. R.L. Lumber Co.,* 279 S.W. 546 (Tex.Civ.App.—Beaumont 1926, no writ). The timber contract in *Kirby* provided for Kirby to sell timber to the buyer, who was obligated to make periodic payments. The buyer assigned the contract, which was binding upon the parties' assigns. The assignee cut and removed the timber from Kirby's land but refused to pay for it. The court held that the assignee acquired not only the right to enforce performance against Kirby, but "it also assumed the burdens imposed by the contract." *Kirby,* 279 S.W. at 549; *see also McCormick v. Krueger,* 593 S.W.2d 729, 730–31 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.).

■ In interpreting whether an assignee impliedly agreed to assume an assignor's obligations, courts look to the language of the assignment and to the surrounding cir-

cumstances. *See Keyes v. Sharer,* 14 Mich.App. 68, 165 N.W.2d 498, 501 (1969). The question of interpretation is ordinarily more a question of fact than of law. *Keyes,* 165 N.W.2d at 501. Courts have found implied assumptions where (1) the benefit was so entwined with the burden that the assignee was estopped from denying assumption and (2) the assignee would otherwise be unjustly enriched. *See generally* 4 A. CORBIN, CORBIN ON CONTRACTS § 906 (1951 & Supp.1991).

For example, a Washington court held that an assignee could be estopped from denying assumption where the assignee's beneficial use of a culvert, which was the subject of an agreement between the obligor and assignor, was entwined with the obligor's right to a provision requiring indemnity for damage to the culvert. *Northern Pac. Ry. Co. v. Sunnyside Valley Irrigation Dist.,* 11 Wash.App. 948, 527 P.2d 693, 695 (1974). In a similar case, a lessee leased a mare for breeding purposes under a contract providing for return of his money if the mare did not produce a live foal. The assignee bought the mare from the lessor. When the mare was pronounced sterile, the lessee sued the lessor's assignee for the return of his money. The court refused to find an implied assumption as a matter of law. *Keyes,* 165 N.W.2d at 501. It has been explained that, when an assignee receives nothing from the lessee, the assignee is not unjustly enriched at the lessee's expense. Thus, the assignee should not have to pay. *See* 4 A. CORBIN, CORBIN ON CONTRACTS § 906, at 325 (Supp. 1991).

*Kirby* likewise can be explained on principles of estoppel and unjust enrichment. The assignee would be unjustly enriched if he received "all the benefits" of the contract—timber—without the concomitant burden—payment. The present case, however, is clearly distinguishable. Lone Star did not pay Mexia "reimbursement" for the severance taxes. Mexia received no benefit from Lone Star; Mexia was not unjustly enriched. In addition, any benefit Mexia

received from the contract was not entwined with the indemnity burden.[3]

■ Lone Star would have us hold that, if an assignee receives any benefit, no matter how tangential, from the contract, then the assignee impliedly assumes all of the contract's burdens, no matter how tangential. We decline to so hold. We note that claims by a payor demanding that an assignee return money already paid on grounds that the assignor has failed to perform the contract constitute claims for restitution, which are governed by equitable principles. *Irrigation Ass'n v. First Nat'l Bank,* 773 S.W.2d 346, 350 (Tex.App.—Dallas 1989, writ denied). The equities here clearly favor the assignee, Mexia. There was no evidence that Mexia knew of Reita's prior breach of contract. The operator's certificate and the closing agreement between Mexia, Reita, and Quadco warranted that an attached list recorded all of Reita's outstanding indebtedness incurred in connection with operation of the Edwards Well; that list did not include any outstanding tax liability.

■ On the other hand, there was evidence that Lone Star knew or should have known that Reita had breached its contractual duty to pay the taxes. The Texas Tax Code requires a first purchaser of gas, such as Lone Star, to pay the tax and to withhold that amount from payments to the producer. TEX. TAX CODE ANN. § 201.-204 (Vernon 1982). A first purchaser is liable for the tax and must satisfy itself that the tax has been or will be paid by the producer, the person primarily liable for the tax. TEX. TAX CODE ANN. § 201.251 (Vernon 1982). In addition, the contract stated that the taxes were to be paid "within the time and manner provided by law," and the law provided that such taxes were to be paid on a monthly basis. *See* TEX. TAX CODE ANN. §§ 201.201 & 201.203 (Vernon 1982). However, the cover letter on the Reita division order stated: "Reita will be responsible for taxes from initial deliver-

---

**3.** Lone Star argues that Mexia received, as benefits from the contract, favorable pricing provisions and the right to enforce take-or-pay provisions. Lone Star acknowledges, however, that Mexia had no means to profit from the gas contract.

ies through March 1982." The cover letter was dated May 3, 1982—after such time as the taxes were due. The contract also contemplates the seller's failure to pay taxes and provides that, if such failure occurs, the buyer shall pay the taxes and deduct the amount from its payments to the seller. Thus, we infer that Lone Star should have known and may have known of Reita's breach. We hold that Mexia did not impliedly assume the indemnity obligation.

We overrule the points of error and affirm the trial court's judgment.