drillers2 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-95-00019-CV







Showdown Energy Corporation and Resolution Operating, Inc., Appellants



v.



Drillers, Inc., Appellee







FROM THE DISTRICT COURT OF FAYETTE COUNTY, 155TH JUDICIAL DISTRICT


NO. 93V-022, HONORABLE DAN R. BECK, JUDGE PRESIDING







 This appeal arises from a lawsuit brought by Drillers, Inc. ("Drillers"), alleging
that appellants, Resolution Operating, Inc. ("Resolution") and Showdown Energy Corporation
("Showdown"), assumed liability for the outstanding debt owed by Caloco Energy, Inc.
("Caloco") to Drillers, a company that drills oil and gas wells. The trial court awarded Drillers
$266,376.99 in actual damages, $29,247.95 in pre-judgment interest and $30,000 attorneys' fees,
with additional provisional awards in the event of an appeal. In four points of error, appellants
assert that, as a matter of law, they did not assume liability for the debt owed by Caloco to
Drillers. We will reverse and render judgment that Drillers take nothing.



BACKGROUND


 Showdown is in the business of raising money to drill oil and gas wells. 
Showdown raises funds from outside investors and industry participants and then invests with
other companies, which become the operators of the wells. Showdown entered into joint
operating agreements involving four wells with Caloco. Two of those wells, the Thompson and
the Ledbetter, are the subject of this suit. The agreements between Showdown and Caloco
covering the Thompson and Ledbetter wells expressly provided that the parties did not intend to
create any type of partnership or association in which the parties would be liable as partners. In
accordance with these joint operating agreements, Showdown purportedly paid Caloco
$3,459,445.86 to drill the wells in exchange for working interests ranging from 75-80% in the
wells. 

 Problems developed because Caloco failed to pay several vendors, one of which
was Drillers. In February and March of 1992, Caloco and Drillers contracted to drill the
Thompson and Ledbetter wells. Upon completion of the wells, Drillers charged Caloco
$941,249.14, but Caloco only paid $674,872.15. Other vendors, in a similar position to Drillers,
began to remove their equipment, and landowners, who were not being paid their royalty
interests, were threatening to sue to terminate the leases. Several of these vendors, including
Drillers, filed liens on the equipment from the two wells. 

 At the same time, Showdown believed that Caloco was marking up charges to
Showdown and diverting revenues. Concerned about its investment, Showdown entered into a
settlement agreement with Caloco. Under this settlement agreement, operational control of the
wells was taken from Caloco and given to Resolution, a new company formed by Showdown
specifically for this purpose. Resolution was assigned Caloco's working interests in the four wells
in which Showdown had participated, including the Thompson and the Ledbetter. Although no
money was paid, Caloco acknowledged in the agreement that they had received sufficient and
valuable consideration in exchange for the transfer of the properties. The settlement agreement
further stated that "Caloco hereby assigns to Resolution all of Caloco's future (post-September 1,
1992) rights and obligations under the Subject JOAs." 

 Resolution took over operational control of the wells on September 1, 1992 and
took steps to get the Thompson and Ledbetter wells, which had been shut-in, to produce. The
settlement agreement further provided that Net Production Runs ("NPRs") (1) from Caloco's former
working interests were to be paid in the order of priority set forth in the agreement. According
to the agreement, unpaid royalty owners were the first category to be paid with the NPRs. The
second category consisted of Showdown's investors for revenues that had been diverted from them
while Caloco was operating the wells. Third, NPRs were to be paid to vendors and creditors of
Caloco, like Drillers, for expenses that arose prior to September 1, 1992. 

 Shortly after entering into the settlement agreement with Caloco, Resolution sent
a letter to 78 vendors, including Drillers, which had supplied Caloco with goods and services
without being paid. The letter noted that Caloco owed vendors around $1,800,000, not including
an estimated $300,000 to $400,000 owed by Caloco to Showdown. In the letter, Resolution noted
that it was "bewildered" by Caloco's actions and then listed the available options as Resolution
saw them. 



OPTION 1: All creditors could join together to force Caloco into Involuntary
Bankruptcy.


 * * *


OPTION 2: Each creditor could act independently and seek judgment against
Caloco.


 * * *


OPTION 3: STOP THE BLEEDING. Take operational control of the wells and
their accompanying revenue as well as assets relating to or apparently purchased
with funds which should have been paid to the vendors, royalty owners &
investors. Demand an agreement with Caloco to take control of their Overriding
Royalty Interests and Working Interest portion for the benefit of the creditors. 
Caloco had also purchased acreage and taken farmout on acreage surrounding the
Ledbetter Well, apparently with approximately $300,000 of monies paid by
Showdown for payment to creditors.



 Resolution informed the vendors that it had selected Option 3 and that "they were
extremely concerned that there be a complete understanding by all vendors and creditors that
Showdown had not created this debt, did not agree with the methods of operation of Caloco and
were willing to attempt to make the best of an extremely bad situation for all concerned." 
Resolution further stated that it could "forestall any additional loss of revenues and . . . could then
commence re-work operations to place the wells back into production for the benefit of all with
outstanding debts." 

 According to the testimony of Sherry Crisco, the president of both Showdown and
Resolution, "[a]pproximately 90% of the vendors agreed to go along with our proposal." 
However, Crisco further testified that, as a result of Resolution's endeavors, "Showdown Energy
has only gotten monies back that it put up in loans to pay royalty owners and pay monthly
operating expenses." The second payment level has not yet been reached.

 Drillers initially brought suit against Caloco and Resolution. After Caloco filed
its Suggestion of Bankruptcy, Drillers added Showdown as a defendant and dropped its case
against Caloco. At trial, a single issue was submitted to the jury, which found by a
preponderance of the evidence that Resolution and Showdown had assumed the liability for the
outstanding debt owed by Caloco to Drillers.



DISCUSSION


 In their first two points of error, appellants argue that the trial court erred in
rendering judgment against them because there is legally, or alternatively factually, insufficient
evidence that appellants assumed liability, expressly or implicitly, for the outstanding debt owed
by Caloco to Drillers, and appellants assert that judgment should have been rendered in their favor
as a matter of law. 

 Appellants argue that Resolution, as Caloco's assignee in the settlement agreement,
assumed only Caloco's obligations arising after September 1, 1992 and that, because Showdown
was not an assignee, it did not assume any of Caloco's obligations. Even if Showdown was found
to be an assignee of Caloco, appellants argue that Showdown also assumed only Caloco's
obligations arising after September 1, 1992 as set forth in the settlement agreement.

 Drillers acknowledges that Showdown's self-authored settlement agreement
expressly states that neither Showdown nor Resolution intended to assume Caloco's liabilities. 
However, Drillers contends that the doctrine of assignment cum onere prevents appellants from
receiving the benefits of the contract without assuming the corresponding burdens. (2) 

 Relying on Lone Star Gas Co. v. Mexia Oil & Gas, Inc., 833 S.W.2d 199 (Tex.
App.--Dallas 1992, no writ), Drillers argues that, if the assignment in this case is restricted to
include only future rights and obligations (post September 1, 1992) as appellants contend, the
wells' production or benefits will be separated from the debt or burden which Drillers incurred
in making the production possible. Id. at 203. Drillers thus claims that appellants would be
unjustly enriched and that this is exactly the inequitable result at which the doctrine of assignment
cum onere is directed.

 It is generally presumed that an assignee assumes the liability as well as the benefits
of an assignment unless the language or the circumstances indicate the contrary. See Schultz v.
Weaver, 780 S.W.2d 323, 325 (Tex. App.--Austin 1989, no writ); Howard O. Hunter, Modern
Law of Contracts ¶ 21.05 at n.72 (1993). Courts look to the language of the assignment as well
as to the surrounding circumstances when determining whether an assignee impliedly agreed to
assume an assignor's obligations. Lone Star, 833 S.W.2d at 202-03.

 If an unambiguous written instrument is worded such that it can be given a definite
legal meaning or interpretation, the court will construe the contract as a matter of law. Coker v.
Coker, 650 S.W.2d 391, 393 (Tex. 1983); Callaway v. Overholt, 796 S.W.2d 828 (Tex.
App.--Austin 1990, writ denied). As long as the provisions of the contract are not contradictory,
the contract should be construed in its entirety so that no provision is rendered meaningless. 
Coker, 650 S.W.2d at 393; Asset Restructuring Fund v. Liberty Bank, 886 S.W.2d 548, 551 (Tex.
App.--Austin 1994, writ denied). 

 Because unambiguous contracts are construed as a matter of law, it is not necessary
for this Court to defer to the trial court's interpretation of the contract. Coker, 650 S.W.2d at
393; Asset Restructuring Fund, 886 S.W.2d at 550. Rather, in interpreting an unambiguous
contract, we attempt to give effect to the intentions of the parties as expressed in the instrument. 
Snyder v. Eanes Indep. Sch. Dist., 860 S.W.2d 692, 697 (Tex. App.--Austin 1993, writ denied). 
When the parties disagree over the meaning of an unambiguous contract, we do not look at the
parties' present interpretation. First City Nat'l Bank v. Concord Oil, 808 S.W.2d 133, 137 (Tex.
App.--El Paso 1991, no writ). Rather, we must determine the parties' intent by looking at the
agreement itself, and we must enforce an unambiguous contract as it is written. Id.

 "Courts are reluctant to imply covenants or duties in a contract in the absence of
obvious necessity or compelling public policy reasons." Snyder, 860 S.W.2d at 696. We must
look to the language of the assignment and to the surrounding circumstances when interpreting
whether an assignee impliedly agreed to assume an assignor's obligations. Lone Star, 833 S.W.2d
at 202-03. The trial court refused Drillers' request for a special issue on unjust enrichment and
instead submitted the sole issue of whether the appellants assumed Caloco's liability to Drillers. 
It was error for the trial court to submit that issue to the jury because the language of the
settlement agreement clearly and unambiguously limited Resolution's liability to Caloco's post-September 1, 1992 obligations. The trial court should have interpreted the contract as a matter
of law and in such a fashion that none of the contractual provisions were rendered meaningless. 



CONCLUSION


 Because we find that the language of the assignment was clear and unambiguous,
we conclude that the trial court erred in not interpreting the assignment as a matter of law. Based
on the language of the assignment and the surrounding circumstances, we hold as a matter of law
that neither Resolution or Showdown assumed liability for the outstanding debt owed by Caloco
to Drillers which arose prior to September 1, 1992. We sustain points of error one and two and
thus do not address appellants' remaining points. Accordingly, we reverse and render judgment
that appellee Drillers take nothing. 



 

 Jimmy Carroll, Chief Justice


Before Chief Justice Carroll, Justices Jones and B. A. Smith


Reversed and Rendered


Filed: January 10, 1996


Do Not Publish


1.   Net Production Runs consisted of income from the sale of the production from the wells
minus the monthly operating costs.
2.   Assignment cum onere is defined as: "With the burden; subject to an incumbrance or
charge. What is taken cum onere is taken subject to an existing burden or charge." Black's
Law Dictionary 455 (6th ed. 1990). Drillers cites Lone Star Gas Co. v. Mexia Oil & Gas,
Inc., 833 S.W.2d 199, 202-03 (Tex. App.--Dallas 1992, no writ) (citing Kirby Lumber Co. v.
R.L. Lumber Co., 279 S.W. 546, 549 (Tex. Civ. App.--Beaumont 1926, no writ), and
McCormick v. Krueger, 593 S.W.2d 729, 730-31 (Tex. Civ. App.--Houston [1st Dist.] 1979,
writ ref'd n.r.e.)), as authority for this doctrine.


gal meaning or interpretation, the court will construe the contract as a matter of law. Coker v.
Coker, 650 S.W.2d 391, 393 (Tex. 1983); Callaway v. Overholt, 796 S.W.2d 828 (Tex.
App.--Austin 1990, writ denied). As long as the provisions of the contract are not contradictory,
the contract should be construed in its entirety so that no provision is rendered meaningless. 
Coker, 650 S.W.2d at 393; Asset Restructuring Fund v. Liberty Bank, 886 S.W.2d 548, 551 (Tex.
App.--Austin 1994, writ denied). 

 Because unambiguous contracts are construed as a matter of law, it is not necessary
for this Court to defer to the trial court's interpretation of the contract. Coker, 650 S.W.2d at
393; Asset Restructuring Fund, 886 S.W.2d at 550. Rather, in interpreting an unambiguous
contract, we attempt to give effect to the intentions of the parties as expressed in the instrument. 
Snyder v. Eanes Indep. Sch. Dist., 860 S.W.2d 692, 697 (Tex. App.--Austin 1993, writ denied). 
When the parties disagree over the meaning of an unambiguous contract, we do not look at the
parties' present interpretation. First City Nat'l Bank v. Concord Oil, 808 S.W.2d 133, 137 (Tex.
App.--El Paso 1991, no writ). Rather, we must determine the parties' intent by looking at the
agreement itself, and we must enforce an unambiguous contract as it is written. Id.

 "Courts are reluctant to imply covenants or duties in a contract in the absence of
obvious necessity or compelling public policy reasons." Snyder, 860 S.W.2d at 696. We must
look to the language of the assignment and to the surrounding circumstances when interpreting
whether an assignee impliedly agreed to assume an assignor's obligations. Lone Star, 833 S.W.2d
at 202-03. The trial court refused Drillers' request for a special issue on unjust enrichment and
instead submitted the sole issue of whether the appellants assumed Caloco's liability to Drillers. 
It was error for the trial court to submit that issue to the jury because the language of the
settlement agreement clearly and unambiguously limited Resolution's liability to Caloco's post-September 1, 1992 obligations. The trial court should have interpreted the contract as a matter
of law and in such a fashion that none of the contractual provisions were rendered meaningless. 



CONCLUSION


 Because we