COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



EL PASO NATURAL GAS COMPANY,
EL PASO FIELD SERVICES
COMPANY, EL PASO ENERGY
CORPORATION, EL PASO ENERGY
WARWINK I COMPANY, L.L.C., AND
EL PASO ENERGY WARWINK II
COMPANY, L.L.C.,

 Appellants,

v.

LEA PARTNERS, L.P.,

 Appellee.

§

§

§

§

§

No. 08-01-00310-CV

Appeal from the

143rd Judicial District Court

of Ward County, Texas

(TC# 00-04-19707-CVW)




 

MEMORANDUM OPINION

 This is an appeal from the granting of summary judgment on liability and a bench trial on
damages. For the reason stated, we affirm in part, and reverse and remand in part.
 

I. SUMMARY OF THE EVIDENCE
 Appellee, Leapartners, L.P., brought this suit against Appellants, El Paso Natural Gas
Company (“EPNG”), El Paso Field Services Company (“EPFS”), El Paso Energy
Corporation (“EPEC”), El Paso Energy Warwink I Company, L.L.C. (“Warwink I”), and El
Paso Energy Warwink II Company, L.L.C. (“Warwink II”), alleging that they were liable for
breach of an option or non-compete provision in a contract between Leapartners and EPNG.
Leapartners and EPNG entered into a contract known as the “Agreement of Sale Concerning
the Jal Plants and Gathering System” (“the Agreement”), under which EPNG agreed to sell
to Leapartners two natural gas processing plants in New Mexico and a network of gathering
pipes that connect those plants to gas wellheads in New Mexico and the adjoining counties
in Texas. Leapartners paid $27,500,000 to EPNG for the purchase of these gas gathering,
processing, and treating assets, known as the “Jal Plants,” and related pipelines and contracts.
The issue in this case revolves around the non-competition provision found in Paragraph 38
of the Agreement. Paragraph 38 provides: 
38. New Gas Supplies. During a period expiring ten (10) years after the Second Transaction
Date, if EPNG undertakes to purchase or gather gas (other than gas which it has undertaken
to purchase or gather as of the date of this Agreement) in the geographical area located
within ten (10) miles of any part of the System as it exists on the date hereof, EPNG will
offer to Buyer the option of gathering, treating, compressing, dehydrating and processing
such gas on the same terms as set forth in the Gathering Agreement. 

The parties stipulated that the Second Transaction Date was November 1, 1991. Leapartners
and EPNG modified the geographical limits of Paragraph 38 by a letter agreement dated
January 17, 1995. Appellants maintain that Paragraph 38 was binding only on EPNG, while
Leapartners argue that under Paragraph 39, Paragraph 38 is binding on all of the Appellants.
Paragraph 39 provides: 
39. Binding Effect; Assignment. This Agreement is binding upon EPNG and Buyer and upon
their respective successors and assigns. Except as provided in this paragraph, neither EPNG
nor Buyer shall assign its rights hereunder without the prior consent of the other party to this
Agreement. EPNG shall have the right at any time after the Second Transaction Date to
assign its right, title and interest hereunder to a wholly owned subsidiary, to its parent
company, or to a wholly owned subsidiary of its parent company without obtaining the
consent of Buyer, provided EPNG shall not be relieved of its obligations hereunder and such
assignment shall not have the effect of limiting, delaying or diminishing Buyer’s rights and
remedies hereunder. Prior to the Second Transaction Date, Buyer shall have the right to
assign its right, title and interest hereunder to, in whole or in part, in divided or undivided
interests or to an entity or entities controlled by any of Buyer’s partners or any member or
members of the family of such partners or the shareholders of such partners. After the Second
Transaction Date, Buyer (and any prior assignees permitted under the previous sentence) may
transfer all of its rights hereunder without limitation. Buyer shall not be relieved of its
obligations hereunder by reason of any assignment of its rights hereunder. 

At the time Leapartners and EPNG signed the Agreement, EPFS, Warwink I and Warwink
II were not in existence. In 1993, EPFS was formed as a wholly-owned subsidiary of EPNG
for the purposes of owning and operating facilities for gathering, dehydration, purification
and product extraction activities (“field services”). In 1999, EPFS created Warwink I and
Warwink II as wholly-owned subsidiaries which also provide field services. Leapartners
alleged that these three entities breached the Agreement by providing field services in the ten
mile area, without first offering Leapartners the option to perform such services. In 1999,
EPFS began gathering and processing gas from the C.G. Ludeman “B” Well located in
Loving County, Texas (“Ludeman Well”). On September 28, 1999, Leapartners sent EPNG
a letter requesting “strict compliance” with the Agreement. On November 1, 1999, EPNG
responded that it “is not in the business of gas processing or gathering and has never
considered or undertaken gas processing or gathering in the area covered by Paragraph 38
of the Agreement . . . .” EPNG also stated that it had no subsidiary in the business of
processing or gathering gas in the area covered by Paragraph 38. EPNG did admit that EPFS,
“an affiliate,” may be gathering and treating gas from the Ludeman Well, but stated that it
(EPNG) remained in compliance with all stipulations and provisions of the Agreement. 
Leapartners filed a motion for partial summary judgment in which it requested that the court
find Appellants each bound by the obligations of Paragraph 38 and that each were liable for
breach of Paragraph 38. Appellants filed a motion for summary judgment in which they
argued that 1) EPNG had not assigned any of its rights, obligations, or liabilities under the
Agreement to any affiliate, subsidiary, or parent company; 2) EPFS, EPEC, Warwink I and
Warwink II had not expressly assumed or received an assignment of any of EPNG’s rights
under the Agreement; and 3) EPNG had never attempted to purchase or gather gas in an area
covered by Paragraph 38. The trial court granted Leapartners’ motion for partial summary
judgment, finding Appellants bound by the obligations of Paragraph 38 and responsible for
breaching their obligation under Paragraph 38. The court also denied Appellants’ motion for
summary judgment and motion for summary judgment on their counterclaims. Following a
bench trial on damages, the court awarded Leapartners $10,451,865 in damages, attorneys’
fees, and costs. This appeal follows.
II. DISCUSSION
 Appellants bring eight issues on appeal, with numerous sub-issues. We begin with a
discussion of the summary judgment standard of review and Issue No. One, followed by a
discussion of the legal and factual sufficiency standards of review and Issue Nos. Two
through Eight. 
A. Summary Judgment Standard of Review
 The standard of review on appeal is whether the successful movant at the trial level carried
its burden of showing that there is no genuine issue of material fact and that a judgment
should be granted as a matter of law. See Lear Siegler, Inc. v. Perez, 819 S.W.2d 470, 471
(Tex. 1991); Nixon v. Mr. Property Management Co., 690 S.W.2d 546, 548 (Tex. 1985);
Cortez v. Liberty Mut. Fire Ins. Co., 885 S.W.2d 466, 469 (Tex. App.--El Paso 1994, writ
denied). Thus, the question on appeal is not whether the summary judgment proof raises fact
issues as to required elements of the movant’s cause or claim, but whether the summary
judgment proof establishes, as a matter of law, that there is no genuine issue of material fact
as to one or more elements of the movant’s cause or claim. See Gibbs v. General Motors,450
S.W.2d 827, 828 (Tex. 1970).
 
In resolving the issue of whether the movant has carried this burden, all evidence favorable
to the non-movant must be taken as true and all reasonable inferences, including any doubts,
must be resolved in the non-movant’s favor. See Nixon, 690 S.W.2d at 548-49;DeLuna v.
Guynes Printing Co., 884 S.W.2d 206, 208 (Tex. App.--El Paso 1994, writ denied). Where
the defendants are the movants and they submit summary evidence disproving at least one
essential element of each of plaintiff’s causes of action, then summary judgment should be
granted. See Perez, 819 S.W.2d at 471; Bradley v. Quality Serv. Tank Lines, 659 S.W.2d 33,
34 (Tex. 1983); Cortez, 885 S.W.2d at 469. Furthermore, when a trial court’s order granting
summary judgment does not specify the ground or grounds relied on for the ruling, summary
judgment will be affirmed on appeal if any of the theories advanced are meritorious. See
State Farm Fire & Cas. Co. v. S.S., 858 S.W.2d 374, 380 (Tex. 1993); Rogers v. Ricane
Enter. Inc., 772 S.W.2d 76, 79 (Tex. 1989). 
In Issue No. One, Appellants attack the trial court’s finding that they are liable for breach of
EPNG’s non-compete agreement. Appellants argue that EPNG did not breach the agreement
and that EPFS, Warwink I and Warwink II did not agree to the non-competition provision. 
In interpreting whether an assignee impliedly agreed to assume an assignor’s obligations,
courts look to the language of the assignment and to the surrounding circumstances. See Lone
Star Gas Co. v. Mexia Oil & Gas, Inc., 833 S.W.2d 199, 202-03 (Tex. App.--Dallas 1992,
no writ) (citing Keyes v. Sharer, 14 Mich. App. 68, 165 N.W.2d 498, 501 (1969)). The
question of interpretation is ordinarily more a question of fact than of law. Id. at 203 (citing
Keyes, 165 N.W.2d at 501). Courts have found implied assumptions where (1) the benefit
was so entwined with the burden that the assignee was estopped from denying assumption
and (2) the assignee would otherwise be unjustly enriched. See generally 4 A. Corbin,
Corbin on Contracts § 906 (1951 & Supp. 1991).
 Generally, the assignor of a contract remains liable for performance of the
obligations which he assumed therein, even after it is assigned. Potts v. Burkett,
278 S.W. 471, 473 (Tex. Civ. App.--Eastland 1926, no writ). The assignee of a
contract is not bound to perform the assignor’s obligations under the contract
unless they are expressly or impliedly assumed by the assignee. Id.; Int'l Ass'n of
Machinists v. Falstaff Brew. Corp., 328 S.W.2d 778, 782 (Tex. Civ. App.--Houston
1959, no writ). In order to expressly assume a contractual obligation, there must
be actual promissory words, or words of assumption, on the part of the assignee.
Lone Star Gas, 833 S.W.2d at 203 (citing 4 A. Corbin, Corbin on Contracts§ 906, at
632 n.1). 
An illustrative case is Kirby Lumber Co. v. R.L. Lumber Co., 279 S.W. 546 (Tex. Civ.
App.--Beaumont 1926, no writ). The timber contract in Kirby provided for Kirby to
sell timber to the buyer, who was obligated to make periodic payments. The buyer
assigned the contract, which was binding upon the parties’ assigns. The assignee
cut and removed the timber from Kirby’s land but refused to pay for it. The court
held that the assignee acquired not only the right to enforce performance
against Kirby, but “it also assumed the burdens imposed by the contract.” Kirby,
279 S.W. at 549; see also McCormick v. Krueger, 593 S.W.2d 729, 730-31 (Tex. Civ.
App.--Houston [1st Dist.] 1979, writ ref’d n.r.e.).
 The summary judgment evidence established that in January, 1996, EPNG
transferred its “Field Systems and Other Field Assets” to EPFS. In the Agreement
of Transfer, EPFS agreed “to assume, pay, perform, fulfill, and discharge all
Assumed Liabilities . . .” and EPNG agreed “to retain, pay, perform, fulfill,
discharge, and remain liable for all Retained Liabilities . . . .” “Assumed
Liabilities” included “all costs, expenses, liabilities, and obligations arising out
of, in connection with, or resulting from the following, to the extent such are
attributable to the periods of time on or after the Closing Date . . . (d) all
contractual obligations of [EPNG] included within or consisting of Related
Interests.” “Related Interests”included “all real property rights, licenses,
leases, benefits, orders, authorizations, and agreements, associated with and/or
necessary for the operation of the Transferred Properties, together with all
encumbrances, liabilities, and obligations incident thereto.” 
It is clear from this unambiguous language that EPFS expressly assumed EPNG’s
contractual obligations associated with the acquisition of EPNG’s field services
business and thus is bound to the terms of Paragraph 38 as a matter of law.
Moreover, Paragraph 39 expressly provides that all of the terms and provisions
of the Agreement shall be binding on EPNG and Leapartners “and upon their
respective successors and assigns.” Paragraph 39 also provides that “EPNG shall
not be relieved of its obligations hereunder and such assignment shall not have
the effect of limiting, delaying, or diminishing Buyer’s rights and remedies
hereunder.” As noted above, EPNG remains liable to Leapartners for
performance of the obligations even after the assignment. Potts, 278 S.W. at 473.
 Next, it is undisputed that EPFS created Warwink I and Warwink II as
wholly-owned subsidiaries to provide field services. In 1999, EPFS began
gathering and processing gas from the Ludeman Well in Loving County, Texas.
Moreover, Appellants admitted in their summary judgment response that “EPFS
and/or Warwink I and Warwink II have undertaken to purchase and gather gas
from a limited number of wells that are within the area covered by paragraph
38.” They just maintain that they are not bound by Paragraph 38. 
Considering the summary judgment evidence presented, we find that such
evidence establishes, as a matter of law, that Appellants are bound by Paragraph
38 of the Agreement and that Appellants are in breach of their obligations under
the Agreement. Issue No. One is overruled. We now address the remaining issues
relating to damages. 
B. Legal and Factual Insufficiency Standards of Review
 In considering a “no evidence” legal insufficiency point, we consider only the
evidence and inferences that tends to support the jury’s findings and disregard
all evidence and inferences to the contrary. Weirich v. Weirich, 833 S.W.2d 942,
945 (Tex. 1992); Pool v. Ford Motor Co., 715 S.W.2d 629, 634-35 (Tex. 1986); Garza v.
Alviar, 395 S.W.2d 821, 823 (Tex. 1965); Texas Tech Univ. Health Sciences Ctr. v.
Apodaca, 876 S.W.2d 402, 411 (Tex. App.--El Paso 1994, writ denied). If more than a
scintilla of evidence supports the questioned finding, the “no evidence” point
fails. Tseo v. Midland Am. Bank at 893 S.W.2d 23, 25 (Tex. App.--El Paso 1994, writ
denied); Hallmark v. Hand, 885 S.W.2d 471, 474 (Tex. App.--El Paso 1994, writ denied).

An “insufficient evidence” or factual insufficiency issue involves a finding that
is so against the great weight and preponderance of the evidence as to be
manifestly wrong. The test for factual insufficiency issues is set forth in In re
King’s Estate, 150 Tex. 662, 244 S.W.2d 660, 661-62 (1951). In reviewing an issue
asserting that a finding is against the great weight and preponderance of the
evidence, we must consider all of the evidence, both the evidence which tends to
prove the existence of a vital fact, as well as evidence which tends to disprove
its existence. It is for the jury to determine the weight to be given to the
testimony and to resolve any conflicts in the evidence. Carrasco v. Goatcher, 623
S.W.2d 769, 772 (Tex. App.--El Paso 1981, no writ). The jury’s finding should be
sustained if there is some probative evidence to support it and provided it is not
against the great weight and preponderance of the evidence. Id. Thus, we cannot
substitute our judgment for that of the fact finder even if we find a fact
contrary to that found by the jury. If, however, the verdict is so contrary to the
great weight and preponderance of the evidence as to be manifestly unjust, the
issue should be sustained. 
In Issue No. Two, Appellants argue that the trial court erred in awarding
damages for anticipatory breach. Anticipatory Breach is a breach “committed
before there is a present duty of performance, and it is the outcome of words
evincing intention to refuse performance in the future.” King Features Syndicate
v. Valley Broadcasting Co., 42 F. Supp. 107, 108 (N.D. Tex. 1941); see also Chavez v.
Chavez, 577 S.W.2d 306, 307 (Tex. App.--El Paso 1979, writ ref’d n.r.e). In order for
a statement to be deemed repudiation, “a party’s language must be sufficiently
positive to be reasonably interpreted to mean that the party will not or cannot
perform.” Restatement (Second) of Contracts § 250 cmt. b (1979). The effect of
anticipatory repudiation is to give the aggrieved party the option of treating the
repudiation as a breach or ignoring the repudiation and awaiting the time of
performance. See Ingersoll-Rand Co. v. Valero Energy Corp., 997 S.W.2d 203, 211
(Tex. 1999). A breach by non-performance gives rise to a claim for total breach
only if it so substantially impairs the value of the contract to the injured party
at the time of the breach. Restatement (Second) of Contracts § 243(4) (1979). 
Appellants contend that the trial court failed to recognize that EPNG’s
termination was valid and that it incorrectly concluded that the notice of
termination constituted an anticipatory breach. It is undisputed by either party
that the date of termination of Paragraph 38 of the Agreement of Sales was “ten
(10) years after the Second Transaction Date,” meaning November 1, 2001.
However, Appellants argue that because the provisions of the “Gathering
Agreement” were incorporated in Paragraph 38 they had an option to terminate
ten years after the First Transaction Date, February 24, 2001. We disagree. The
terms of Paragraph 38 were unambiguous in selecting the expiration date as ten
years after the Second Transaction Date. We are unconvinced by Appellants
argument that Paragraph 12.2 of the Gathering Agreement would pre-empt over
the termination date provided in Paragraph 38 of the Agreement of Sale. There
is no indication in the record from which this Court could determine that there
was “valuable, bargained-for-contract right” to terminate Paragraph 38 prior
to the ten year provided in such paragraph. We find that Appellants could not
terminate Paragraph 38 prior to the expiration date provided in it. We further
find that the trial court did not err in awarding damages for the anticipatory
breach of the provisions in Paragraph 38, and overrule Appellants’ Issue No. Two.

In Issue No. Three, Appellants argue that the trial court erred in awarding
damages that were outside the scope of the Agreement of Sale. When interpreting
a contract, “the primary concern of courts is to ascertain and to give effect to
the intentions of the parties as expressed in the instrument.” Haddad v. Wood, 949
S.W.2d 438, 441 (Tex. App.--El Paso 1997, writ denied) (citing Coker v. Coker, 650
S.W.2d 391, 393 (Tex. 1983); Duracon, Inc. v. Price, 817 S.W.2d 147, 149 (Tex. App.--El
Paso 1991, writ denied). If the interpretation of the contract is at issue, the
courts must first determine if the language of the provisions in question are
ambiguous. Id. “If the written instrument is so worded that it can be given a
certain or definite legal interpretation, then it is not ambiguous and the court
will construe the contract as a matter of law.” Coker v. Coker, 650 S.W.2d 391,
393 (Tex. 1983). A contract is ambiguous if it is uncertain or reasonably
susceptible to more than one meaning.Id. If a contract is determined ambiguous,
the granting of summary judgment is improper since the determination of it
becomes an issue of fact. Id. at 394. However, if there is no ambiguity, the terms
of a written instrument become questions of law for the court. See Westwind
Exploration, Inc. v. Homestate Sav. Ass’n, 696 S.W.2d 378, 381 (Tex. 1985). 
Both Appellants and Appellee agree that Paragraph 38 of the Agreement of Sale
is unambiguous. However, Appellants contend that the trial court’s
interpretation of Paragraph 38 of the Agreement of Sale is improper. Namely, the
trial court’s conclusion of law No. 4 states:
Defendant’s obligations to Leapartners under Paragraph 38 of the Agreement
also cover all gas purchased by Defendants at “delivery” or “receipt points”
located within the area covered by Paragraph 38, whether or not the surface
location of the wells delivering gas to those delivery points are within the
Paragraph 38 area. This includes all wells covered by the gas purchase
contracts that are Plaintiff’s Exhibits 22 and 27. 

Appellants further contend that this Court should find that there can be no
damages for wellheads found outside the Ten Mile Area set forth in Paragraph
38. We disagree. After throughly reviewing the language in Paragraph 38 and in
the remainder of the Agreement, we have found no language that suggests that
Paragraph 38 will only apply to wellheads found within the compound of the Ten
Mile Area. Paragraph 38 specifically states that “. . . if EPNG undertakes to
purchase or gather gas . . . in the geographical area located within ten miles of
any part of the System as it exists . . . EPNG will offer to [Leapartners] the option
of gathering, treating, compressing, dehydrating, and processing such gas . . . . ”
(emphasis added). The amendment made to Paragraph 38 in 1995 speaks to
wellheads found west of specific west lines. However, we do not find this
amendment to Paragraph 38 to limit Appellants’ liability in regards to the
purchase or gathering of gas within the Amended area covered under Paragraph
38. Similarly, this Court does not agree with Appellants’ statement that the
Amendment to Paragraph 38 shows an interpretation different from that reached
by the trial court or that it implies that the inclusion or exclusion from the Ten
Mile Area depends on the location of the wellhead. 
Furthermore, Appellants argue that in some instances they could not have
fulfilled the 
requirements of the Gathering Agreement


 and therefore could not fulfill the
trial court’s interpretation of Paragraph 38. We find this reasoning inconsistent
with the language of the Gathering Agreement. Appellants reason that
Paragraph 38 is only relevant to gas that Appellee could gather, treat,
compress, dehydrate and process. We do not find this to be the case. Paragraph
38 language specifically gives the option to Leapartners to offer the
aforementioned services in regards to all purchase and gathering EPNG does
within the Ten Mile Area. We do not find anything in the Gathering Agreement
that would indicate otherwise. For the reasons stated above, we overrule
Appellants Issue No. Three. 
In Issue No. Four, Appellants assert that the trial court erred in awarding
damages for a “weighted average charge.” Appellants argue that in order to be
subject to the “weighted average charge” provision, any gas would have to be
delivered at “Receipt Points” in the “Gathering System”.


 Since Appellee’s
damages model delivers the gas to the Keystone plant, 


Appellants contend the
trial court erred in awarding damages for a “weighted average charge.”
Appellants also contend that Paragraph 5.04 of the Gathering Agreement
provided that the “weighted average charge” would equal the amount Appellee
charged third parties for use of the “Facilities”


 and since the only facility that
would have been used is the Keystone plant, no “weighted average charge”
should have been assessed. Finally, Appellants argue that Appellee had no
contracts under which it could have received any processing charges from third
parties. 
We will first dispense with whether the use of the Keystone plant inhibits the
award of damages for the “weighted average charge.” This Court is unconvinced
by Appellants’ argument in regards to this matter. Appellants seem to have
overlooked Article I, Paragraph 1.11 of the Gathering Agreement which states:
1.11 “Plant” or “Plants”- shall mean the Plants as defined in the Agreement of
Sale owned and/or operated by Leapartners as well as any new, replaced,
modified or enlarged processing facilities installed and owned by Leapartners
at such Plants and shall also include other natural gas processing plants in the
area to the extent Leapartners or Sid Richardson Carbon & Gasoline Co.
(“Richardson”) uses such other plants to perform Leapartners’ obligations
hereunder.
 
(emphasis added). We agree with Appellee in that the Agreement of Sale and the
Gathering Agreement clearly contemplated and expressly provided that
Appellee could use any of the facilities or plants in the area that it operated or
those operated by its affiliate, Sid Richardson Carbon & Gasoline Co. For this
reason, we find that the trial court did not err in awarding damages for a
“weighted average charge.”
 In regards to Appellants’ argument that Appellee had no contracts under which
it could have received any processing charges from third parties, this Court
disagrees. Appellee, represented by its affiliate and at the time general partner
of Leapartners, L.P., Richardson, took many gas contracts. Wayne Farley’s
testimony established that Appellee had to seek contracts since it did not inherit
any gas purchase or gathering agreements from Appellant at the time the Jal
facilities transaction took place. Farley’s testimony further establishes that
it took one year for Appellee to “sign up the gas.” For the reasons stated above,
Appellants’ Issue No. Four is overruled. 
In Issue No. Five, Appellants argue that the trial court erred in awarding
damages for an “additional gathering fee.” Appellants contend that Appellee did
not bring forth evidence to prove that an “additional gathering fee” was
warranted due to an “unaccountable gas loss” of less than 3.5 percent. Appellee
introduced the expert testimony of Wayne Farley, Director of Operations for Sid
Richardson Companies. Farley testified that Appellee had brought the
“unaccountable gas” levels down considerably


 within the first year of the
acquisition of the Jal System. Appellants were aware of this and were charged
the four cent (4¢) differential set forth in Paragraph 5.04 of the Gathering
Agreement. Furthermore, Appellee brought forth the expert testimony of Carey
McGregor, P.E. McGregor also testified as to the reduction of the
“unaccountable gas” levels. Appellants argue that Appellee provided no basis,
other than speculation, on which to assess the likelihood that the
unaccountable gas losses in the system would have been less that 3.5 percent. We
disagree. We find that Appellee has introduced more than a scintilla of evidence
from which the trial court could find damages for the “unaccountable gas”
levels. The fact that Appellee had already brought down the levels in the
existing pipelines and that Appellants were already being charged the four cent
(4¢) differential stipulated in Paragraph 5.04 of the Gathering Agreement
provides more than a scintilla of evidence that it was likely that the new
facilities would have had “unaccountable gas” levels of less than 3.5 percent.
For the reasons stated above, Issue No. Five is overruled. 
In Issue No. Six, Appellants argue that the trial court erred in awarding damages
for lost profits. Appellants contend that there is no evidence, or in the
alternative factually insufficient evidence, to support the trial court’s finding
that Appellee’s damages began to accrue on December 1, 1999. Farley testified
that two to three months would have been necessary to get the permits and build
the facilities necessary to hook up the gas in the West Gas Area. Appellee
presented testimony stating that there is no need to “double ditch” the
right-of-ways in the area. Appellee’s evidence was based on actual jobs in the
area, rather than theoretical estimates. Additionally, Farley testified that the
work on the Emperor Field region could be completed in about a month. In
considering only the evidence that tends to support the trial court’s finding, we
find that Appellee has brought forth more than a scintilla of evidence and
therefore Appellants’ no evidence point fails. 
Appellants argue that in the West Area, extensive construction would have been
necessary before Appellee could receive any gas. Also, a substantial quantity
of the pipe would have to be laid out in rock and heavy sand, taking more time and
expense to complete. Furthermore, Appellants introduced evidence that
landowners in the area would require the pipes to be “double ditched”, which was
not accounted for by Appellee’s figures. Finally, Appellants’ expert witness
testified that in order to gather the required permits, it could take at least 45
days and as long as six months. However, Appellants’ own expert used the 45 days
to calculate the time necessary for permits. Also, Appellee introduced testimony
that the “double ditch” was not required by landowners in the area. Appellants
concede that Appellee could have done the required construction in the Emperor
area and actions to hook-up the gas in 30 days. Having analyzed the whole of the
record before us on this issue, this Court does not find the trial court’s finding
awarding damages for los profits be so contrary to the great weight and
preponderance of the evidence as to be manifestly unjust. For the reasons stated
above, we overrule Issue No. Six in its entirety. 
In Issue No. Seven, Appellants argue that the trial court erred in failing to
reduce damages for capital costs. Appellants contend that the trial court
should have reduced the award of damages by at least $3.5 million, rather than
the $2,070,206 that the trial court reduced from the damages. They argue that
Appellee brought forth no evidence or rather factually insufficient evidence to
support the capital cost figures. Appellants first contend that Appellee
underestimated their capital costs primarily because they undervalued the cost
to lay the 12-inch pipe and they did not include in their estimates labor costs to
install new gas meters and the costs to acquire permits. The argument is that
since Appellee did not include these two items the total figure cannot be correct.
In cross-examination by Appellee Appellants’ expert witness agreed that the
costs may vary dramatically and that he had not built pipelines in the region in
the last five years. He further conceded that he had not visited with any
ranchers to determine the actual price paid for a pipeline right-of-way.
Furthermore, Appellee’s expert witness, Wayne Farley, introduced evidence
showing actual costs of building a pipeline with similar conditions in the region.
Appellee’s estimate also includes “contingency costs” in case of unknowns. In
considering evidence that tends to support the trial court’s finding, this Court
finds that there is more than a scintilla of evidence to prove the reduction in
capital costs. 
Appellants introduced evidence representing the total cost of laying the 12-inch
pipe would be closer to $13 rather than the $6 estimated by Appellee. Appellants’
expert witness, Alan Stumbaugh, believed based on his experience that Appellee’s
estimate was unreasonable. Furthermore, Stumbaugh estimated the total cost
of the project to be $3,560,000 plus or minus fifteen percent (15%). Appellants’
witness conceded that a prudent operator would take bids from various
contractors in order to build a pipeline. He further agreed that he was not aware
of the prices of pipeline construction prior to the Spring of 2000. Also, he
conceded that the numbers he used were the ones given to him by Appellants and
that the time period he used was based on the time-frame that Appellants
requested. This Court, having analyzed the whole of the record, does not believe
the trial court’s finding to be against the great weight and preponderance of the
evidence in regards to capital costs. This portion of Issue No. Seven is overruled. 
Appellant further contends in a sub-part to Issue No. Seven, that the trial court
erred in calculating depreciation based on a 20-year period. Appellants argue
that this is contrary to the Gathering Agreement because it rendered the
facilities useless close to two years after they were constructed and therefore
proper accounting would not permit a 20-year depreciation for the new facilities.
Evidence shows that the industry practice is to amortize over a 20-year period.



Appellants further argue that they should not be required to subsidize the cost
of equipment that Appellee might use in the future in unrelated business
transactions. However, it is undisputed that these facilities would have been
built for use consistent with business transactions Appellee entered into with
Appellants with regards to the Jal System. Furthermore, Appellee introduced
uncontested evidence that competitors in the region use anywhere between 20
and 30 years to depreciate, including EPNG. It is undisputed that these type of
facilities have a useful life far beyond 20 years. We find the trial court’s finding
is not against the great weight and preponderance of the evidence with regards
to the depreciation of the facilities. For all the reasons stated above, we
overrule Issue No. Seven in its entirety.
 In Issue No. Eight, Appellants argue that the trial court erred in calculating
the prejudgment interest. Prejudgment interest is “compensation allowed by law
as additional damages for lost use of money due as damages during the lapse of
time between the accrual of the claim and the date of the judgment.” See Johnson
& Higgins of Texas, Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 528 (Tex. 1998).
There are two legal sources for awarding prejudgment interest, 1) general
principles of equity and 2) an enabling statute. See id. The Texas Supreme Court
and the Texas Finance Code require that prejudgment interest be calculated as
simple interest. See id. at 532; Tex. Fin. Code Ann § 304.103 (Vernon 1998) (current
version at Tex. Fin. Code. Ann § 304.104 (Vernon Supp. 2003)). Prejudgment interest
begins to accrue either 180 days after the defendant receives written notice of
a claim or the date the suit is filed. See Johnson & Higgins, 962 S.W.2d at 531. The
holding of the Texas Supreme Court in regards to prejudgment interest in Johnson
& Higgins applies to all cases in which judgment is rendered on or after December
11, 1997. See id. at 533. 
Appellants contend that the trial court erred by compounding the interest. We
agree. It is established law that prejudgment interest shall be calculated as
simple interest by both common law and statute. See Johnson & Higgins, 962 S.W.2d
at 532; Tex. Fin. Code Ann § 304.103 (Vernon 1998) (current version at Tex. Fin.
Code. Ann § 304.104 (Vernon Supp. 2003)). Additionally, Appellants contend that
the prejudgment interest rate should be 6 percent pursuant to Section 302.002 of
the Texas Finance Code. Tex. Fin. Code Ann. § 302.002 (Vernon 1998). Appellants
argue that the 1998 version of the statute applies because it was in effect when
the cause of action arose. Appellants cite Aquila Southwest Pipeline, Inc. v.
Harmony Exploration, Inc. to support their argument. 48 S.W.3d 225 (Tex. App.--San
Antonio 2001, pet. denied). However, we find this case to be distinguishable with
respect to the application of Section 302.002. In Aquila, Harmony filed a suit
against Aquila in August 13, 1996. Aquila, 48 S.W.3d at 232. This is more than three
years prior to the revision of September 1, 1999 of this statute. This cause of
action was filed on November 11, 1999. Prior to that, Appellee sent Appellants a
demand letter on September 28, 1999. On September 1, 1999, Section 302.002 was
revised to what it is now Tex. Fin. Code Ann. § 302.002 (Vernon Supp. 2003). We
therefore find the latter to be inapplicable. The new Section 302.002 is under a
sub-chapter of the Texas Finance Code entitled “Usurious Interest.” Id. This is a
breach of contract and for this reason common law applies. See De La Morena v.
Ingenieria E Maquinaria de Guadalupe, S.A., 56 S.W.3d 652, 659 (Tex. App.--Waco 2001,
no pet.). For the reasons stated above, we find that the trial court properly set
prejudgment interest at 10 percent, however, we further find that the court
erred in compounding the interest. Appellants’ Issue No. Eight is overruled.
 We affirm the judgment of the trial court as to Appellants’ Issue Nos. One
through Seven, but reverse the judgment as it to relates to Issue No. Eight and
the compounding of interest. We remand the cause to the trial court for
proceedings not inconsistent with this opinion.
August 14, 2003 

RICHARD BARAJAS, Chief Justice


Before Panel No. 3
Barajas, C.J., Larsen, and Chew, JJ.